# John R. Coppin Company, a Corporation v. Richards, Admr.

(Decided May 31, 1921.)

## Appeal from Kenton Circuit Court (Common Law and Equity Division).

1. Negligence—Actionable Negligence—Circumstantial Evidence.—Actionable negligence can be established by circumstantial evidence in the same way as other facts are proven.

2. Negligence—Injury Resulting from One of Two or More Causes—Directed Verdict.—When the evidence shows that the injury may have resulted from any one of two or more causes only one of which is chargeable to defendant, and the inference that the injury resulted from one cause is no stronger than that it resulted from another, the defendant is entitled to a directed verdict in its favor, but if the proven facts are such that a reasonable person would readily infer or deduce the ultimate fact of negligence on the part of defendant resulting proximately in the injury of plaintiff, the case is one for the jury although there is no direct evidence of negligence.

O. M. ROGERS, WM. J. DEUPREE and CLORE, McCASLIN & SCHWAB for appellant.

T. J. EDMONDS and R. C. SIMMONS for appellee.

Opinion of the Court by Judge Sampson—Affirming.

The $7,000.00 judgment which this appeal seeks to reverse was recovered by the administrator of Sidney Harris in the Kenton circuit court against the John R. Coppin Company, incorporated, for the death of Harris in an elevator accident upon the averment and proof by circumstantial evidence that the death was the result of the negligence of the agents and servants of the corporation. Harris was a young man about twenty-four years of age, in good health and a trained electrical worker. He was engaged by a firm of electricians, independent contractors, to help them install lights and electrical fixtures in the garage part of the John R. Coppin Company store building in the city of Covington. To do the work Harris and his associates were required to carry the wire from a connection in the ceiling of the first story of the building through the hole made in the floor for the elevator shaft to the basement. The wire had to be encased in conduits so as to make it safe, and attached to

the walls of the building and the supports of the elevator in the shaft so as to make it secure. While lying on the floor of the first story with his head and shoulders extending into the elevator shaft, his face downward, engaged in connecting the electric wire or conduit to some part of the shaft equipment or building, the elevator car, which was at the third floor above, noiselessly descended and caught and killed Harris. The defendant company denied negligence on its part and pleaded contributory negligence on the part of Harris. A trial resulted in a verdict for $7,000.00, on which the judgment, from which this appeal is prosecuted, was rendered.

The John R. Coppin Company appeals, assigning as grounds for reversal of the judgment the following:

(1) The pleadings do not support the judgment.

(2) The court admitted incompetent evidence for the plaintiff over the objection of the defendant company.

(3) The court should have sustained defendant's motion made both at the conclusion of plaintiff's evidence and at the conclusion of all the evidence for a directed verdict in its favor.

(4) The court erroneously instructed the jury as to the law of the case.

Each of these contentions will be considered, but before we do so a statement of the facts somewhat in detail will be given.

The Coppin Company owned a large, seven-story building in the city of Covington in which were located three elevators, two of which were near the front of the building and used for carrying passengers, while the third was in the rear of the building and was used for carrying freight between the basement and the fourth story, its termini. The accident to and death of Harris happened in the freight elevator shaft. The Coppin Company uses the first, second and third stories of the building in its retail store business, and employed the seventh floor and the basement for storage purposes. The fourth floor is leased to and occupied by the Kenton Pharmaceutical Company, a patent medicine concern, which has the use of the freight elevator to carry its goods up and down, and had storage in the basement. This last named company had three persons in its employ at the time of the accident, a pharmacist, an expressman and a porter named Lee. The expressman was out of the building and had been for some time. The phar-

macist never used the elevator except upon rare occasions when the porter Lee was out, and says he did not use or attempt to use it on the day of the accident, and there is no evidence or even suggestion that he did do so. We will consider Lee's connection with the elevator later.

The Coppin Company employed a number of people, both men and women, in and about the store, but none of these used the freight elevator on the morning of the accident except Steinborn, the shipping clerk, and four porters named Davenport, Page, Harris and Brogan, unless someone not accustomed to use it did so, and there is no evidence of this.

The real question of fact in the case being who started the elevator which killed Harris we see by the process of elimination that only the four porters of the Coppin Company, the Pharmaceutical Company's porter, Lee, and the deceased and the other two electricians need be considered, for they are the only ones shown to have had opportunity to set the elevator in motion.

It is not seriously argued, nor could it be, that Harris or any of the electricians started the car, for every motive and reason is against such inference, and the direct evidence shows they did not do so. Coming now to the porter, Lee, who was in the basement at the time Harris met his death, the evidence shows that he had been working around the place for some months, and on the morning of the accident had carried a load of express from the fourth floor of the building down on the freight elevator to the first floor and to the basement, where he left it and began looking about some boxes. While thus engaged the porters of the Coppin Company took the elevator to the third floor. Lee waited a short time for the elevator to return and then called up to those in charge of it on the third floor and asked for it, but was told that the elevator was in use but he could have it later. He then sat down on a box in the basement to wait for the elevator which he desired to use in taking his truck back to the fourth floor. He was close to the elevator shaft and the electricians were working in it above connecting the wires and conduits. Harris, the deceased, called to Lee to hand him a wrench which was in the basement. Lee looked for it but did not at first see the wrench, whereupon Harris told Lee it was on a box and Lee took it and tried to reach it up to Harris, who was lying on his abdomen on the floor above, with his head and shoulders

projecting into the elevator shaft and looking down at Lee. Finding the distance too great Lee procured a keg and stood on it and reached the wrench to Harris. When he stepped down he glanced up the shaft and saw the elevator noiselessly descending and very near Harris, who was engaged in his work. The imminent peril of Harris so excited Lee that he began to scream, "Stop the elevator," but before Harris could or did move his head and shoulders were caught between the elevator car and the edge of the concrete floor and so mashed that he died shortly thereafter. It is insisted by appellant company that Lee started the car, or at least it argues that the inference to be drawn from the evidence is as great that he started the car as that any other person, including the Coppin Company's employes, started it. This insistence is based upon the fact that he was accustomed to operate the car and had been waiting for it to carry his truck to the fourth floor; that he was close to the cable by which the elevator was operated and that his desire for the elevator had prompted him to pull the cable and cause the car to descend. But there is no evidence to support this theory. Lee testified he did not start the car; that he was not in reach of the cable and did not intend to or try to operate the car. He says the rule was to call "elevator" when one wanted to use the car and if it was in use the one using it would inform the one wanting it and he would wait.

When told that morning that the car was in use Lee sat down to wait and did wait. There is no presumption that Lee would have violated the rule about the elevator that morning especially when there was absolutely no evidence that he had ever done so before. The evidence shows that it only took the elevator a few seconds to travel from the third floor to the first floor. Lee could not have started the elevator unless he did so before Harris asked him to hand up the wrench. When this request was made by Harris the wrench could not be found by Lee and he looked around for it, and when he found it he tried to hand it up to Harris but found he could not reach him, so he obtained a keg and stood upon it so as to pass the wrench to Harris, who was then reaching down through the elevator hole as far as he could. After reaching the wrench to Harris he stepped down from the keg and glanced up into the shaft and saw the elevator coming down, but not quite to the first floor. Lee was sitting

down when Harris asked for the wrench. These facts conclusively prove that Lee did not start the elevator, for if he had done so the car would have reached the first floor where Harris was long before it did. In other words the time occupied by Lee in finding and handing up the wrench was much greater than that required for the elevator car to run from the third floor to the first floor and Lee did not have an opportunity to operate the cable during that time. Aside from this every other circumstance appears to refute the theory that Lee started the car, and this we will advert to later.

The only other persons about the building whom the evidence tends to show had an opportunity to start the elevator were the four porters in the employ of the Coppin Company working on the third and seventh floors. These men, Davenport, Page, Harris and Brogan, were in charge of and operating the elevator; they had raised it from the basement to the third floor and were loading it with rubbish to be carried to the basement. While they each say, except Brogan, who did not testify, they did not start the elevator and were not on the third floor where it was when it started down, they all admit they had the car in control and could have operated it at any time by pulling the cable. There is much conflict in their testimony. The stuff they had loaded was on the car but other stuff was yet to be loaded before it went down, according to their contention as gleaned from the evidence. However this may be, the fact is the car started on its downward course while at the third floor in the possession and under the control of the porters of the appellant company, and it is insisted by appellee administrator that the inference, deduction and belief may reasonably be drawn and had from these facts and circumstances proven that the car was set in motion by one or the other of the four.

This brings us to the only serious question of law on this appeal, which is, did the court err in overruling defendant's motion for a directed verdict and in submitting the case to the jury? Were the proven facts and circumstances such that a reasonable person would have deduced the conclusion that the elevator car was set in motion by the hand of the Coppin Company's agents? If it was the judgment should not be disturbed, but if the evidence was not of such probative value as to sustain the deduction, inference and belief in the mind of a rea-

sonable person that the car was started on its death-dealing course by the hand or agency of the appellant company, then the judgment should be reversed. The motion of the Coppin Company for a peremptory instruction to the jury to find for it was based upon the idea that there was no direct or other evidence of any probative value that the elevator car was set in motion by appellant or its agents or servants, or at most there was such slight circumstantial evidence as is wholly insufficient to support the verdict and which evidence was equalized by other circumstances which rendered it impossible to determine with any degree of certainty whether the injury and death of Harris were the result of one or the other of two or three causes only one of which would fix liability on the Coppin Company. In other words, appellant insists that the inference to be drawn from the proven facts is equally consistent with its non-liability as with its liability, that there is an equilibrium of evidence and that in such case it is the duty of the trial court to take the case from the jury because a verdict would be the result of mere speculation on its part. This court has frequently recognized the rule that when the evidence shows that the injury may have resulted from any one of two or more causes, only one of which was due to defendant's negligence, and the inference that the injury resulted from one cause was no stronger than that it resulted from the other or others, a verdict for the plaintiff cannot be sustained. L. & N. R. R. Co. v. Guesto, 32 Ky. L. R. 670; Cochran v. Krause, 144 Ky. 202; McDonald v. Lou. Car Wheel & Supply Co., 149 Ky. 801; The Lock Malleable Iron Co. v. Graham, 147 Ky. 161.

This doctrine is confidently relied upon by the Coppin Company on this appeal.

It may be stated as a well recognized principle that negligence, like any other fact, may be proven by circumstantial evidence; that is, by proving facts from which a reasonable person would readily infer the ultimate fact of negligence. Direct evidence by an eye-witness was not any more necessary in this case to prove the contested fact than in any other case. The question of fact to be determined by the jury was who started the elevator on the downward trip at the time it struck and killed appellee's decedent, and this fact could as well be established by circumstantial evidence as any other fact, such as the strik-

ing off a blow or the firing of a shot which took the life of a human being.

In stating the nature and efficacy of circumstantial evidence Prof. Greenleaf, in his most excellent work on evidence, gives the following illustration:

"If a witness testifies that he saw A inflict a mortal wound on B, of which he instantly died; this is a case of direct evidence; and, giving to the witness the credit to which men are generally entitled, the crime is satisfactorily proven. If a witness testifies that a deceased person was shot with a pistol, and the wadding is found to be a part of a letter addressed to the prisoner, the residue of which is discovered in his pocket; here the facts themselves are directly attested; but the evidenc they afford is termed circumstantial, and from these facts, if unexplained by the prisoner, the jury may or may not deduce, or infer, or presume his guilt, according as they are satisfied or not of the natural connection between similar facts, and the guilt of the person thus connected with them."

Other writers have held that the difference between circumstantial evidence and that which is denominated direct evidence is merely one of logic and of no practical significance; that all evidence is more or less circumstantial; all statements of witnesses, all conclusions of juries are the result of inference, the difference being only in degree.

It is conceded by all parties to this litigation that the elevator car would not start without the aid of an outside agency. Someone must pull the cable to set it in motion, but once in motion it would travel in the direction it was going to the terminus of the shaft and there rest until again set in motion by an independent agency. It follows, therefore, that some one, either the servants of the appellant company, those of the pharmaceutical company, or the electricians engaged in work in the shaft, started the elevator.

With these facts conceded let us look into the situation as it existed at the instant the elevator started from the third floor landing on its downward course immediately before it struck and killed Harris. The servants of the Coppin Company had been using the car at the third floor to load some stuff. The car was in their possession and under their control; some of the stuff to be loaded was on the elevator, but other articles were to be placed upon it

and the Coppin Company's servant or some of them had left the elevator to go for the remainder of the load.

The third floor was exclusively used and occupied by the Coppin Company. There were no persons on that floor except the servants of the company and they all had easy access to the elevator. The Pharmaceutical Company occupied the fourth floor and there was but one man in its service on that floor at the time and he could not have reached the elevator but could have reached the cable. He testified he did not start the elevator nor touch the elevator cable before the car started on that morning. If he had started the car it would, no doubt, have been up and not down. All the other persons who had opportunity to start the elevator were on lower floors. The electricians did not have any use for the elevator and did not start it nor do anything to set it in motion. The colored porter Lee in the basement testified he did not start the elevator and he is partly corroborated by other witnesses, besides had he started it he could have and likely would have stopped it by the same means by which he started it when he realized the peril to which Harris was exposed with his body projecting into the shaft, and would not have began screaming: "Stop that elevator," as he did immediately before the car struck Harris. His cries, "Stop the elevator," were intended no doubt for the one who started it, and being a part of the *res gesta* plainly support the theory that he did not start the elevator. So with the car in the possession of and under the control of the servants of the Coppin Company at the third floor used exclusively by that company we think the circumstances are such that a reasonable person might well conclude that some one of the said four servants of the Coppin Company who were working in connection with the car started the elevator. At least the facts and circumstances tend much stronger to support this inference and deduction than that the elevator was set in motion by some person in the basement or the electricians than whom there were no others.

It cannot be said that the evidence as to negligence or no negligence on the part of the servants of the Coppin Company is equal or at equilibrium. On one side the facts are that the elevator was in the possession and under the control of the servants of the Coppin Company, who had the right and power to move it; it was at the

third floor, which floor was occupied and used exclusively by the Coppin Company, and all of the servants of the Coppin Company were in position to set the elevator in motion. On the other side there were no other persons in the building who had possession of the car or who were on the floor of the building from which it started at the time it began to move, and while all persons in the employ of the Coppin Company testifying denied starting the elevator, the circumstances which surround the unfortunate happening are such as to convincingly indicate that neither the porter Lee nor any other person in the basement or shaft started the elevator because they were put in danger by it, and the conduct of Lee after he discovered the elevator moving downward was such as to negative the slight inference that he started it and to raise and support the inference that he did not do so. It is always to be presumed that one will not do anything which will directly imperil his life or that of his associates with whom he is on good terms, and this presumption in the absence of evidence to the contrary operated to exonerate Harris, Hanly and Ensly, who were working in and about the elevator shaft. We, therefore, conclude that the verdict of the jury is supported by sufficient evidence to sustain it.

No one will seriously contend that the appellant company and its agents in charge of the elevator car did not owe Harris and the other men working in and about the elevator shaft the duty of giving reasonable and timely warning of the starting of the elevator under the facts of this case. This is true even though Harris was not in the employ of the Coppin Company but was working for an independent contractor. There was such a relation between the company and Harris as imposed upon the company this duty. The company's assistant superintendent Macklin, directly in charge of the work of installing the electrical apparatus and of the moving of the goods from the third floor by the porters, knew that the electricians were working in and about the shaft, for he had started them there and had seen them there only a few moments before the accident. He also knew the danger of operating the elevator car while these men were so engaged. He knew that the car was at the third floor and would soon come down, but he did not instruct or warn the operators of the elevator to look out for or signal the electricians on the movement of the car. As

the servants of the Coppin Company moved the car up the shaft that morning one member of the crew told the electricians that they could now work in the shaft as the car would be at the third floor for awhile, which plainly evidenced the speaker's knowledge of the danger of operating the car while persons were in or about the shaft, and that he anticipated that the men would likely go to work in the shaft.

All the employes of the Coppin Company knew that the electricians, including Harris, were at work in and about the shaft and that the elevator could not move up and down the shaft with safety to them while they were so engaged. With this knowledge it was plainly the duty of the persons in charge of the elevator car to give reasonable and timely notice of the movements of the car and a failure to do so rendered them and their principal liable in damages for the injury inflicted regardless of the fact that Harris was in the employ of an independent contractor. National Concrete Construction Co. v. Duvall, 150 Ky. 198; Otis Elevator Co. v. Wilson, 147 Ky. 676; Standard Oil Co. v. Titus, 187 Ky. 560.

Harris was not guilty of contributory negligence, for he was instructed to work in the elevator shaft by one having authority to regulate the movements of the elevator and he was expected to be there and had the right to expect a warning from the persons in charge of the elevator before it moved. As the elevator car descended noiselessly he could not be expected to hear it, especially when he was engaged in work at which he made more or less noise. His face was down and his attention fixed upon his work, which was exactly beneath where he lay. He had been told that the elevator would remain at the third floor for awhile and that he could work in the shaft. If he failed to use reasonable care to get out of the way of the elevator after he knew or by the exercise of ordinary care could have known of the descent of the car and his injury resulted from such failure his administrator was not entitled to recover. This question was one of fact for the jury and was properly submitted and found against appellant.

But it is said that Harris assumed the ordinary risks of the business and of the known danger of the particular work he was doing, and this is true, but he did not assume the risks of danger to him occasioned by the negligence of the servants of the Coppin Company, nor of the negli-

gence of anyone. He had a right, in view of the fact that his presence in the shaft was to be anticipated, to expect those having the elevator in charge to give reasonable and timely notice of its movements, and that they would not noiselessly slip the elevator down upon him and take his life.

Nor is it important, under the facts of this case, that the plaintiff was unable to show by direct evidence which of the servants of the Coppin Company started the elevator, for the Coppin Company owed Harris the duty to instruct each of them in the operation of the elevator while the electricians were in or about the shaft and it is admitted by Macklin, the assistant superintendent, that he did not so instruct them or any one of them. This was gross negligence which, if it contributed to bring about the injury, as it appears it did, renders appellant company liable.

Judgment affirmed.