DAVIES FLYING SERVICE, Inc. et al.
v. UNITED STATES.
No. 2036.

United States District Court
W. D. Kentucky, Louisville.
Sept. 17, 1953.

J. L. Richardson, Jr., Louisville, Ky., A. J. Deindorfer, Louisville, Ky., for plaintiff.

Charles F. Wood, Asst. U. S. Atty., Louisville, Ky., Norris W. Reigler, Asst. U. S. Atty., Louisville, Ky., for defendant.

FORD, District Judge.

Jurisdiction is here invoked under the so-called Federal Tort Claims Act, 28 U. S.C. §§ 1346, 2674, for the recovery of money damages resulting from the loss of an airplane alleged to have been caused by the negligence .of an employee of the Government while acting within the scope of his employment.

The pertinent facts appearing from the evidence are, in substance, as follows: On August 15, 1950, the plaintiff Davies Flying Service, a Kentucky corporation, entered into a contract with the Civil Aeronautics Administration, an agency of the Department of Commerce, which was in full force and effect at the time of the occurrences upon which the plaintiff's claim is based. By the terms of the contract, the plaintiff agreed for a specified rental rate to furnish and have available at Bowman Field in Louisville, Ky., when requested, for use of certified pilots of the Civil Aeronautics Administration a "Cessna 170A aircraft" equipped for day and night flying in accordance with CAR 43, with a sensitive altimeter, turn and bank indicator, clock with sweep-second action," rate of climb indicator, and a very high frequency omni-directional radio range (VOR) receiver, and directional gyro.

The contract further provided:

"SC–1. Services to be Included in the Rental Rate:

"The following services are to be provided in the rental fee per hour:

\* \* \* \* \* \*

"(f) The contractor shall assume full responsibility for loss of or damage to the rented aircraft, and agrees to save the Government harmless from liability for damage to the property of and injury to or death of third persons, except that due to negligence on the part of Government personnel in line of duty."

On or about December 1, 1950, the plaintiff Davies Flying Service transferred all its property and assets to its co-plaintiff Louisville Flying Service, Inc., which has joined as plaintiff and is now the only plaintiff in interest.

On the morning of October 3, 1950, at Bowman Field in Louisville, pursuant to the contract, the plaintiff Davies Flying Service delivered a Cessna Aircraft 170, certificate No. N5483C to Joseph W. Fagan, Safety Engineer for the Civil Aeronautics Administration, for his use in making a flight on business of the Government to Lexington, Ky., and return. According to the testimony, Mr. Fagan was a competent and highly skilled aircraft pilot who "had flown that type of aircraft many hours on many occasions". Mr. Harry A. Gerard, a District Airport Engineer, who was not a pilot, accompanied Mr. Fagan. So far as the evidence shows their flight to Lexington, where they landed at Blue Grass Airfield, was without significant incident.

In preparation for their return flight to Louisville, between 3 and 4 o'clock in the afternoon of October 3rd, Mr. Fagan and Mr. Gerard returned to Blue Grass Field and conferred with Mr. D. E. Newton, the meteorologist in charge of the weather bureau located there, in respect to weather conditions for visual flying which appeared at that time to be unfavorable both at Lexington and Louisville. Mr. Newton advised them, however, that the conditions were improving and would probably continue to improve over that entire area. Mr. Fagan then made an effort to make his flight by instrument flying by proceeding from Lexington in a northerly direction with the idea that he might be able to intersect a high frequency beam at what is known as the Georgetown Intersection and follow it by instrument to Louisville. He took off from Blue Grass Field with that end in view but at about 4:20 P.M. he returned to the field and reported to the tower operator Dexter Scott that his radio equipment was inadequate to receive the beam at the Georgetown Intersection. He then telephoned C. F. Clabaugh, his superior in the

office at Louisville, that he would not then return to Louisville but would spend the night at Lexington. However, a further check at about 5 P.M. showed considerable improvement in weather flying conditions both at Lexington and Louisville. After returning from supper it was found that flying conditions had so substantially improved at both points that he was able to secure required clearance from the Airways Traffic Control at Cincinnati, and Mr. Scott, the tower operator, gave him permission to take off under his visual flight plan from Lexington directly to Louisville, which he did at 5:56 P.M. At that time the ceiling at Lexington had risen to 600 feet and visibility had increased to 10 miles, while the ceiling at Louisville had risen to 1400 feet with visibility of 8 miles. According to Mr. Scott's testimony, it was not unusual for aircraft to take off under the weather conditions then prevailing and it satisfactorily appears from the testimony that a pilot, of the skill and experience of Mr. Fagan, was not negligent in so doing. As he passed over Versailles, he reported to the Lexington control tower by radio that he was leaving the control zone and made no complaint as to weather conditions or as to the functioning of his plane. He was not heard from thereafter, but a few minutes later, about 8 or 10 miles further along in the direction of Louisville, in the hill country near Millville, where it appears some fog was encountered, the plane crashed to the ground. The dead bodies of both Mr. Fagan and Mr. Gerard were found in the wreckage of the plane which was so completely demolished that it afforded no evidence as to the cause of the crash. Certain of the witnesses who viewed the ruins found that at the time it struck the ground the plane appeared to have been headed in the opposite direction from Louisville. Marks on the ground appeared to indicate that the propeller was turning when it struck; the condition of the wings, which were compressed like an accordion, indicated that there had been no fire in them; and so far as could be determined by observation the control cables appeared to be in place but there was nothing to indi-

cate that before the crash they were properly operating. Indeed, according to the testimony of James R. Mansfield, Assistant Director for Airplane Development of the State Department of Aeronautics, the demolition of the plane was so nearly complete that "the only part recognizable as an aircraft was near the tail, the rest was all crumpled metal, burned."

Several witnesses who observed the plane in flight shortly before it fell saw a blue flame coming from it; others who appear to have observed it more closely immediately before it fell heard noises from it described as "back-firing and popping" and "sputtering" as it circled over their houses, followed by a burst of flame from the bottom, which illuminated the windows of the plane, as it proceeded above the trees and hilltops. According to Mrs. Otho Kern, it was "like a flash of lightning". It was noticed that immediately the engine appeared to stop or cut out and the plane instantly fell to the ground with a loud explosion and great flare of light when it struck.

Since neither occupant of the plane survived the fall, no living witness is able to throw any light upon the proximate cause of it, nor is proof of the proximate cause supplied by either direct or circumstantial evidence. Whether the fall was due to the negligence of the pilot or to some functional failure of the essential operating mechanism of the plane, some of which, according to the testimony of plaintiff's mechanic H. W. Schuermeyer, had been the subject of previous complaint, or to some other fortuitous event which rendered the pilot helpless, remains an inscrutable mystery.

The most that can be said of the evidence is that it presents nothing more than circumstances upon which theories as to the cause of the tragedy may be multiplied, any one of which is as plausible as the other and all of which rest upon mere conjecture. The lack of proof to support plaintiff's claim is strikingly similar to the situation which appeared in Morrison v. Le Tourneau Co. of Georgia, 5 Cir., 138 F. 2d 339.

Since the contract between the parties places them in the relation of bailor and bailee, the plaintiff contends for the application of the general rule applicable under ordinary contracts of bailment that "If it is shown that the goods were delivered to the bailee in good condition, he will be liable for any loss or injury to them while in his custody, unless he affirmatively establishes that such loss or injury was not due to his failure to exercise due care." Threlkeld v. Breaux Ballard, Inc., 296 Ky. 344, 347, 177 S.W.2d 157, 159, 151 A.L.R. 708; Webb v. McDaniels, 305 Ky. 739, 205 S.W.2d 511; Welch v. L. R. Cooke Chev. Co., 314 Ky. 634, 236 S.W.2d 690. This contention seems to entirely overlook or disregard the special provision of the rental contract providing that "(f) The contractor shall assume full responsibility for loss of or damage to the rented aircraft, * * * except that due to negligence on the part of Government personnel in line of duty". The cases relied upon by the plaintiff contain no such special provision. This provision of the contract is explicit in making liability of the Government for loss or damage to the rented aircraft not dependent, as in ordinary cases of bailment, upon the relationship of the parties but upon an exception to the plaintiff's contractual responsibility for such loss. It is a familiar rule that one who seeks advantage of an exception in a contractual stipulation as the basis of his claim is charged with the burden of proving facts necessary to bring himself within such exception. 20 Am. Jur. § 142, page 148.

Neither does the plaintiff's resort to the doctrine of res ipsa loquitur seem to be of any avail in this case for the Court of Appeals of Kentucky has pointed out in many cases that such doctrine applies only when the thing shown speaks of negligence of the defendant, not merely of the occurrence of an accident. East Kentucky Beverage Co. v. Day, Ky., 248 S.W.2d 923. The record presents no justification for a presumption or inference that negligence was the proximate cause of the accident by showing that it was that character of occurrence which, in the ordinary course of events, would not have happened if due care had been exercised. Thus the indispensable basis for application of the doctrine of res ipsa loquitur is lacking. It therefore seems unnecessary to discuss the presumption of due care which, in the absence of direct or circumstantial evidence of negligence, on account of the natural instincts of self-preservation and personal safety, arises in favor of one charged with negligence in an accident which resulted in his death or to determine the force or effect of such presumption to controvert mere presumptions or inferences to the contrary. Such a presumption is recognized in Kentucky as well as elsewhere. Illinois Central R. Co. v. Applegate's Adm'x, 268 Ky. 458, 468, 105 S.W.2d 153; Wilder's Adm'r v. Southern Mining Co. 265 Ky. 219, 225, 96 S.W.2d 436; Owen Motor Freight Lines v. Russell's Adm'r, 260 Ky. 795, 805, 86 S.W.2d 708. Also see United States v. Fotopulos, 9 Cir., 180 F.2d 631, 637; 20 Am.Jur. 214, § 217.

The rule of law which seems applicable and controlling in this case is that recovery of loss resulting from alleged negligence may not be awarded when the facts and circumstances disclosed show nothing more than that the loss for which compensation is sought may have been due to any one of several causes, for some of which the defendant is not responsible, and is equally as consistent with no negligence as it is with negligence. John R. Coppin Co. v. Richards' Adm'r, 191 Ky. 720, 725, 231 S.W. 229; McAtee v. Holland Furnace Co., Ky., 252 S.W.2d 427, 429.

For the reason that the plaintiff has not sustained the burden of proof resting upon it, the relief sought should be denied and the claim dismissed. Judgment will be entered accordingly.