## McCOY v. CLEGG*
### (No. 1224; June 21, 1927; 257 P. 484.)

PHYSICIANS AND SURGEONS—MALPRACTICE—DAMAGES—EVIDENCE — WITNESSES—APPEAL AND ERROR—EXCEPTIONS—EXPERT WITNESS —REDIRECT EXAMINATION—INSPECTION OF INJURY—QUESTIONS FOR JURY—TRIAL—RES IPSA LOQUITUR DOCTRINE INAPPLICABLE.

1. In action against doctor for malpractice in negligently treating broken collar bone, plaintiff's evidence as to negligence in bandaging arm and to show amount or measure of damages *held* sufficient, as against motion for directed verdict at conclusion of plaintiff's evidence.

2. In action against doctor for malpractice in treating broken collar bone, it is not necessary for plaintiff to prove by valuation, estimates, or computation amount necessary to compensate for injuries, since law provides no exact measure of damages for such injury in action based on negligence.

3. In action against doctor for malpractice in treating broken collar bone, testimony of plaintiff's father relating to plaintiff's condition following accident and effect of defendant's treatment, such as condition of arm after accident, cutting off circulation by bandage, and condition of nerves, *held* not inadmissible, as nonexpert opinion or conclusion, where such matters came under observation of witness.

4. That an answer may be unresponsive is not necessarily nor at all in some cases, sufficient ground for requiring exclusion of testimony, if it is competent and pertinent.

5. In action against doctor for malpractice in treating broken collar bone, testimony concerning plaintiff's nervous condition and backwardness in studies *held* not objectionable, as not responsive, where witness was asked without objection to testify as to plaintiff's nervous condition before and after accident.

6. In Supreme Court errors relied on must, as a rule, be presented on proper exceptions.

7. Alleged errors in admitting or excluding evidence cannot be reviewed, unless exception was taken; mere objection to evidence or ruling, not followed by exception, being insufficient.

8. In malpractice action for negligence in treating broken collar bone, witness' testimony that defendant made no effort to discover cause of plaintiff's suffering ''in my estimation,'' if erroneous, as being ''incompetent and immaterial under the issues of this case,'' *held* not prejudicial, in view of other evidence as to defendant's treatment.

9. In action for malpractice in negligent treatment of broken collar bone, doctor's testimony that he considered bandaging elbow as it was bandaged improper *held* admissable, as opinion of expert witness, though he could not have said that treatment was negligent.

10. In malpractice action for negligence in treating broken collar bone, doctor's testimony that in his opinion manner in which elbow was bandaged caused injury *held* competent, as opinion of expert.

11. Question on redirect examination is not objectionable, as assuming matters not proven or not in evidence, where preceded by cross-examination which assumed substantially the same facts, but required answer concerning different matter, especially where there was some evidence of conditions assumed in such questions.

12. In malpractice action for injury to plaintiff's arm, objection to inspection of arm by part of jury *held* insufficient to present question for review, where objection was not repeated when jurors actually examined arm, and was not made on ground that only part of jurors examined it.

13. In malpractice action for arm, injury permitting portion of jurors to feel plaintiff's arm, though irregular procedure, *held* not prejudicial error, in view of evidence coming into case after demonstration given by doctor who had examined arm.

14. In action against doctor for malpractice in negligently treating broken collar bone so as to cause injury to plaintiff's arm, evidence *held* sufficient to take case to jury.

15. In malpractice action for injury to arm due to negligent treatment of broken collar bone, instruction that proof of negligence need not be by direct testimony, but may be inferred from all facts and circumstances, if they be sufficient to warrant it, if erroneous, *held* not prejudicial, in view of other instructions.

16. In action against doctor for malpractice in treating broken collar bone, resulting in injury to plaintiff's arm under bandage, doctrine of res ipsa loquitur is inapplicable.

*See Headnotes: (1, 2) 30 Cyc. p. 1588 n. 85; p. 1590 n. 3. (3) 22 CJ p. 618 n. 46; p. 619 n. 47. (4) 40 Cyc. p. 2446 n. 54; p. 2447 n. 61, 63. (5) 40 Cyc. p. 2444 n. 53. (6) 3 CJ p. 890 n. 19; p. 895 n. 52; p. 913 n. 97; p. 916 n. 9. (7) 3 CJ p. 912 n. 95; 38 Cyc. p. 1347 n. 63, 64, 65, 66. (8) 3 CJ p. 915 n. 3; 4 CJ p. 975 n. 88; 22 CJ p. 551 n. 49; p. 554 n. 81. (9) 22 CJ p. 639 n. 27; p. 652 n. 32. (10) 22 CJ p. 652 n. 32. (11) 4 CJ p. 704 n. 78, 79. (12, 13) 3 CJ p. 749 n. 42; p. 824 n. 38; 4 CJ p. 983 n. 57. (14) 30 Cyc. p. 1588 n. 83. (15) 38 Cyc. p. 1786 n. 93. (16) 4 CJ p. 1033 n. 37; p. 1035 n. 40; 29 Cyc. p. 622 n. 96; p. 623 n. 97, 98, 99; 30 Cyc. p. 1584 n. 48.

APPEAL from District Court, Sheridan County; JAMES H. BURGESS, Judge.

Action by Eleanor McCoy, a minor, by her next friend, Tom McCoy, against Dr. E. G. Clegg. Judgment for plaintiff, and defendant appeals.

*H. Glenn Kinsley,* for appellant.

Evidence founded on expert knowledge is admissible, but mere opinion is not; 21 R. C. L. 405; Laudon v. Scott, (Mont.) 194 Pac. 488; Pettigrew v. Lewis, (Kan.) 26 Pac. 458; 3 Whart. Med. Jur. 500. The court erred in permitting six of the jurors to examine plaintiff's arm; plaintiff is entitled to the independent judgment of each juror; 10 O. D. 631; 24 Cyc. 185; Minnequa Cooperage Co. v. Hendricks, (Ark.) 197 S. W. 280. It was improper to permit any of the jurors to examine the arm; Willis v. Browning, (Mo.) 143 S. W. 516; Hatfield v. Co., (Minn.) 22 N. W. 176; Felsch v. Babb, (Neb.) 101 N. W. 1011; Landro v. Ry. Co., (Minn.) 135 N. W. 991. The court erred in receiving

testimony from plaintiff's father, as to her physical condition; 11 R. C. L. 574. Improper treatment and negligent treatment are distinct terms; Dishman v. Ass'n., (Wash.) 164 Pac. 943. The court erred in permitting leading questions as to the cause of paralysis; Paterson v. Howe, (Ore.) 202 Pac. 225; 11 R. C. L. 579. The court erred in giving instruction numbered 5, as to negligence; Ewing v. Goode, 78 Fed. 442; Stemons v. Turner, (Pa.) 117 A. 922; Bunyan v. Goddrum, (Ark.) 228 S. W. 403. The rule as to negligence is stated in Ewing v. Goode, supra; see also Schumacher v. Murray Hospital, (Mont.) 192 Pac. 397. Negligence is not to be presumed, it must be proved; Loudon v. Scott, supra; Staloch v. Holm, (Minn.) 111 N. W. 264. The rule as to proximate cause is defined in Lemos v. Madden, 28 Wyo. 1; See also 22 R. C. L. 149. There was failure of proof as to damages, and the jury was left to base its judgment on conjecture and speculation.

*Lonabaugh & Lonabaugh,* for respondent.

Answers made to questions, without objection, are not subject to a motion to strike; Jones Ev. (3rd Ed.) Sec. 895, page 1415. The opinions of ordinary witnesses must often be received; this is especially true as to eye witnesses; Jones Ev. Sec. 360, page 542; Robinson v. Co., 36 Pac. 965; State v. Vanella; (Mont.) 106 Pac. 364. The witness, McCoy, was competent to testify as to the appearance of plaintiff's arm; general objections, without specific grounds, are disregarded; Jones Ev. (3rd Ed.) Sec. 893, page 1411. There was no error in the cross-examination of defendant's expert witness; Jones Ev. (3rd Ed.) Sec. 389, page 589; Ryan v. People, (Colo.) 114 Pac. 306. The maxim "res ipsa loquitur" is inapplicable to malpractice cases; Ewing v. Goode, 78 Fed. 442. There are marked exceptions to this in cases where sponges are left in the body after an operation; Harris v. Fall, 177 Fed. 79; Davis v. Kerr, 46 L. R. A. (N. S.) 611; Palmer v. Humiston, (Ohio) 101 N. E. 283. Instruction number 5, complained of, was given in Wheeler

v. Bowles, (Mo.) 63 S. W. 675, and approved.; the effect of an instruction is not to be determined upon a single statement, but must be considered as a whole in determining its natural effect; Wood v. Wood, 25 Wyo. 26; Loy v. State, 26 Wyo. 381; Baute v. Haynes, (Ky.) 104 S. W. 272; Jamison v. Hawkins, 13 Pa. Sup. Ct., 372. Pain and suffering may be considered as an element of damage; Machen v. Ry. Co., 13 Pa. Sup. Ct. 642. 17 C. J. 826. Error without prejudice does not warrant reversal; Epps v. State, (Ind.) 1 N. E. 491.

POTTER, Justice.

This is a case of alleged malpractice by the defendant below while engaged in the practice of his profession as physician and surgeon. A judgment for $500 was entered against him upon the verdict of a jury. The action was brought in the name of Eleanor McCoy, a minor, by Tom McCoy, her father, as ''her next friend.'' The material averments of the petition are substantially as follows:

That on November 4, 1922, the plaintiff suffered an accident causing the fracture of her right collar bone; that the defendant was employed to set the broken bone and to attend plaintiff until she should be healed of said injury. That defendant set the bone and reduced the fracture, and, in so doing, carelessly, negligently, and unskillfully bandaged the right arm of the plaintiff, at the elbow thereof, so that the circulation in the arm was cut off, and carelessly, negligently and unskillfully permitted the arm to remain so bandaged for a period of about one week, during which time the bandage cut into the flesh and so injured the arm as to cause partial paralysis thereof, and to cause the same to become crooked, so that plaintiff has practically lost the use of the arm, and that in the healing of the wound, caused by the said unskillful and negligent manner of bandaging the arm, the flesh has become drawn, and scar tissue has formed, permanently injuring the arm. That by reason thereof the plaintiff suffered greatly in mind and body, and will continue to suffer for the term of her natural life,

whereby she has been damaged in the sum of Ten Thousand Dollars. That she has incurred additional expense for care of the arm by another physician in the sum of One Hundred Dollars, for which additional sum judgment is also prayed, and for costs.

The several allegations of negligence and the results of defendant's treatment are denied generally by the answer; and that the defendant was careless or negligent at any time in attending the plaintiff is specifically denied; and it is alleged that the defendant used due care in setting the fractured bone and attending plaintiff on account of the injury; that he set the bone and bandaged the arm in the manner that competent and skillful physicians usually care for and attend their patients in like circumstances and skillfully and to the best of his ability rendered medical attention to the plaintiff, and diligently attended and cared for her. The answer also denies specifically that plaintiff has been injured permanently, or in any manner, on account of any negligence, carelessness or unskillful medical treatment or care on defendant's part. It is alleged also in the answer that the defendant was the "company doctor," and paid a monthly retainer by the employees of the Sheridan-Wyoming Coal Company at Monarch to render medical attention to them and their families, including the plaintiff and her father; that the defendant's services were rendered as such "company doctor," and without additional charge or compensation therefor, and such services would have continued, but that plaintiff's father refused to permit the continuance thereof and voluntarily employed another doctor to attend the plaintiff, for which action defendant was not in any wise responsible.

It will be observed that the charges of negligence do not include an express averment of failure to set the broken bone, the only injury alleged to have been caused directly by the accident, or to bring about a perfect and permanent union of the parts separated by the fracture. But the charges are directed to a lack of skill employed in the

method adopted, which seems to have required a bandaging of the right arm, or at least a part of it, for the purpose of bringing the entire arm and hand into a position necessary to bring and hold the broken parts of the bone together. Nor do we understand that the petition charges the adoption generally of an improper method in setting the broken bone. But the charges are, and the evidence on the part of the plaintiff seem to have been intended to show, that the arm at the elbow was unnecessarily bandaged or bandaged too tightly, and allowed to remain in that condition for several days, causing a stoppage or a lack of circulation resulting in the formation of blisters upon the arm and a sore at the elbow from which there was an offensive odor and a gangrenous or putrid condition of the flesh, which subsequently sloughed away, leaving a hole showing, for a time, the underlying cords, and eventually a disfiguring scar, and also for a time a bent or crooked condition and a paralysis or partial paralysis of the arm. It may, however, be said in passing that at the time of the trial nothing of any such described conditions appear to have been observable except the scar, and that the arm then appeared to have so far recovered as to function normally in every respect. This may be better explained, perhaps, by reciting some of the evidence necessary to a disposition of certain exceptions relied on as grounds for reversal.

Mr. McCoy, the father, testified that plaintiff was eight years old at the time of the trial in October, 1923, and was living with him and her mother at the time of the accident, at the coal mining camp, where he was employed by the coal company, and the defendant was employed as "company doctor." That she came home Saturday evening crying and complaining that her shoulder hurt her, they then having no reason to believe that a bone was broken, until the next day, Sunday, when they decided that something was wrong, and sent for Dr. Clegg. That the latter pronounced the collar bone broken in the middle, calling it "just a mere fracture." The witness then described the bandaging

of the arm, including the fingers, with gauze, and the fastening of adhesive tape over the same; the language of which description we need not repeat, but which we understand was intended to show that the right arm was fastened against and across the body in such a manner that the right hand was placed upon the left shoulder. But he did say that by this operation the defendant pulled the bone back in place "while I pulled the adhesive tape across her shoulder, around under her arm, down across her abdomen, and down across the kidneys, back to her stomach." That he then pulled the arm up with the fingers on the point of the elbow with another piece of adhesive tape going clear around the body "until you couldn't see any part of the arm." The manner of bandaging the arm will more clearly appear from other testimony. That witness then testified that the plaintiff complained of pain from Sunday night all the week, during which period the defendant made seven calls, including a visit made after the arm had been taken down and the bandages removed by another doctor who had been called upon a failure to reach Dr. Clegg on Saturday evening. That Dr. Clegg on his various calls explained the pain by saying that it was caused by the arm being in an uncomfortable position; and that the only examination he made at his various calls was to look at the finger nails, though on the 3rd day he gave the plaintiff a pill to relieve the pain and placed a square pad with a towel on the point of the elbow, and with some adhesive tape pulled the arm from one shoulder, advising that it be left so for two or three hours and if it began to hurt again to take the outside bandage off and let the arm down. That on Saturday morning they noticed blood oozing from the bandages and a blister had been discovered upon the arm by the mother, and thereupon, failing to find Dr. Clegg, called in Dr. Crane and before the arrival of Dr. Crane some of the neighbors had been called in, who assisted in removing some of the bandages, disclosing that the arm from the elbow to the hand was covered with blisters and at the elbow appeared to be

dead; quoting now the witness, "looked like a dirty white kid glove where this bandage had cut in there, had cut off the circulation." That the arm was swollen about three times out of proportion above the bandage, which was later reduced somewhat through the advice of Dr. Crane by hot applications, which also reduced the blisters somewhat. That after a few days the injured flesh at the elbow began to come out, an odor became apparent, the cords in the arm could be seen, and in a month the arm was contracted and paralyzed, a condition which lasted until the middle of June.

The mother corroborated the father's testimony and explained the defendant's manner of treating the arm substantially as follows: That he put a bandage around her fingers, one under the elbow and one up "here," and fastened it with adhesive tape. Bandaged the shoulder, forced the shoulders back in place, asked Mr. McCoy to pull the adhesive tape and stick it to her shoulder, "when he had the shoulder back in place." That then he took the rest of the adhesive tape and wound it around her body, turned the arm up "like this," and put the adhesive tape up "around here," to hold it in place so it couldn't slip. Then he took a gauze bandage and started from the abdomen and wound it from her stomach clear up to her neck so you couldn't see her arm, and said he would be back the next day. That upon defendant's next call he said that it was natural that the child should cry, that she would have to have her arm done up as it was for at least ten days; that if he should take the bandage down he would just have to put it back. That on the next day he put his fingers down through the bandage of the neck, felt the collar bone and said it was set perfectly. That he called twice Tuesday, without making any change, but on Wednesday he folded a dish-towel and put it at the point of the elbow, without removing any bandage, strapped it up with adhesive tape and said "Now leave this on for awhile and if she suffers after a little while remove it." He also left a pill for the

child to take. That on Saturday blood showed through the bandage, some neighbors were called in and also Dr. Crane, after trying unsuccessfully to find Dr. Clegg. That the neighbors took off the outside bandage and then the adhesive tape just enough to leave the little arm free. That when Dr. Crane came he took the bandage off at the elbow. That then the arm was black and blistered from the elbow to the hand, and above the elbow it was swollen but without any blisters. That later the blisters were reduced by hot applications under the direction of Dr. Crane and circulation started back in the arm. That at first the arm was practically paralyzed and a big piece sloughed out at the elbow, exposing the cords in her arm, and giving out an odor. That the sore at the elbow did not heal for at least two months. That the extra towel put on Wednesday by Dr. Clegg was soon removed by her or Mr. McCoy, because the child complained more than ever while it was on.

Some of the neighbors called in by Mrs. McCoy on Saturday described the condition of the arm, substantially corroborating in that respect Mrs. McCoy and her husband. Mr. Catterall testified that Mrs. McCoy wanted the bandages removed to relieve the suffering, and that he cut the adhesive plaster covering the arm and fingers and around the body, and used some hot water on the back to get the plaster off but without much success; that the arm was relieved a little, so the child was placed upon a cot with a pillow under her arm, and that was practically all that was done until the arrival of Dr. Crane. He testified to noticing blisters upon the arm and that some blood had trickled down from the elbow; that he did not take any of the bandages off from the elbow or around it; and all that he noticed out of the ordinary were blisters and ''a little sore at the point of the elbow.'' Another neighbor witness, Siegoski, testified that he noticed the blisters, but they had gone down considerably at the time of his later visits, ''but the gash in her arm was awful bad. I could see the cords there. Just took a slight look at it.'' The plaintiff was called to testify

on her own behalf, but it seems unnecessary to refer to it otherwise than to say that she remembered having pain from the second or third day after the broken bone was set and the arm bandaged.

Mr. McCoy, called later for further examination, testified that after nutrition had been cut off from the hand, every finger nail came off; that the child would not notice needles if pricked with them in her fingers and arm until later, when "the nerves gradually came out, and then she would faintly feel what was done, but at the time of trial the hand was "in pretty good shape." It might be stated here that medical witnesses for defendant, who examined plaintiff at the time of the trial, testified that the finger nails showed no indications of having been out and grown in again. Mr. McCoy also made statements as to plaintiff's condition to which we shall later refer when discussing alleged errors in the admission of testimony. Dr. Steffen was called as a witness for plaintiff, but only to testify as to the condition of the arm when he was called in consultation on November 17, 1922. He said that the arm was then swollen; that there were some broken blisters, and a raw place in the bend of the elbow extending across the arm, possibly an inch wide, the flesh there being "necrotic, * * * practically dying off, gangrenous, sloughing out."

Dr. Crane, a practicing physician in the same neighborhood, was the only medical expert called by the plaintiff. As stated above, he had been called on Saturday evening. First asked to state the child's condition then and what he then did in the matter of medical attention, he testified that there had been a swathe—gauze bandages—binding the arm in position, going around the chest and part of the abdomen, which had been cut loose, as had also the adhesive tape which had bound the band over the shoulder. That on the abdomen was much secretion, which ordinarily comes from broken blisters, and the forearm down to the hand and fingers was covered with blisters. That the area at the elbow in the flexed surface resembled dead white tissue, "such as

you get with an electric burn, absolutely bloodless and dead.'' That there were bandages around the elbow, the outer one having been creased across the arm ''being up in that position'' (indicating.) That upon removing that, he discovered the dead condition of the flesh. He then testified further:

''Q. Would you say, doctor, that the dead condition of the flesh there was due to pressure from that bandage by the flexing of the arm? A. Apparently so. Q. What treatment did you prescribe? A. I removed the bandages * * * took them completely off the elbow and arm and the hand as far up as the shoulder where they were not causing any immediate danger at that time. I instructed them to have the little girl lie down and put the forearm on a pillow * * * so the circulation would be most easily kept up, and keep hot processes on it continuously in order to bring back circulation. Q. At the time you cut off this bandage at the elbow, what was the condition of the arm from the elbow down as to circulation? A. Very poor. The arm was so badly swollen that if there was any pulsation in the radial artery at the wrist where the pulse was taken I couldn't feel it, the arm and hand were absolutely cold, and I was afraid that circulation had gone permanently at that time. Q. It was a question then whether you could save the arm or not? A. I thought so. Q. You are familiar with the treatment known as the Sayre treatment for broken collar bones, are you? A. I am. Q. You may state whether or not the binding of the arm to the body by adhesive tape at the muscles between the shoulder and the elbow is proper treatment? A. It is, when properly padded. There must be some gauze underneath the adhesive tape. Q. Now the flexing or the bending of the arm forwards to the shoulder and holding it in place by adhesive over the shoulder and around the body, over the well shoulder, that is also proper? A. That is, absolutely. Q. And what provision do you make in the Sayre treatment for the protection of the elbow from abrasion or anything of that character? A. We protect as much of the arm from the adhesive platser itself as possible. Q. You leave an opening, do you not, at the elbow. A. We leave an opening at the elbow and pad that also. Q. How often, in children, should the pad be examined and the arm to see whether or not everything is working toward the proper healing of the

broken collar bone without danger to the child? A. The dressings have to be inspected quite frequently, for the tendency is for them to slip a little bit. Q. You may state whether or not the wrapping of a bandage around the arm at the elbow such as you found on this child is a proper method of treating a broken collar bone? A. I personally never use any around the elbow. Q. I want to know whether or not you consider that proper treatment. A. It is not described in the text books as I know them. Q. You may state whether it would be proper treatment of a child of eight years, suffering from a broken shoulder, to tie the arm to the body with adhesive tape between the elbow and the shoulder? A. It would. Q. And also by adhesive plaster, flexing the arm across the breast towards the uninjured shoulder, and placing the bandage around the elbow, around the arm at the elbow? A. The placing of adhesive over the arm and up in this position (indicating) is perfectly proper, and as to putting a bandage around at the elbow, I consider that improper.''

He testified on cross-examination that when he first saw the child there was no sloughing, but the flesh was dead and there was evidence of beginning necrosis. That a complication might occur in cases of that kind of necrosis if the arm was not padded there. That ''Where you get two skin surfaces coming together, you may get a slight disturbance of the skin.'' And ''it should be padded there.'' That as a rule in surgery, in treating fractures, skin surfaces should not touch, especially in young children; that if the skin does touch, there will be a slight exfoliation or a slight amount of moisture will collect, and the two surfaces in apposition will lose the skin, as a rule, and there might be a chance of infection. But he said there was no evidence of infection at that time, and that infection did not follow. Asked whether a gangrenous condition is not a form of infection, he replied ''You can have a gangrenous sloughing, and it will come away without infection.'' Continuing his cross-examination he testified:

Q. Was the bandage around the elbow cotton or gauze? A. Gauze and adhesive. Q. Where was the adhesive? A. In the internal surface.  *  *  *  It did not touch the

skin. It was on the outside of the gauze. Q. The blisters; were those in your opinion the result of bandaging? A. The blisters might have been from the constriction at the elbow, or they might have been trophic, that is, where there is a nerve irritation, you will get what we term a trophic blister. Q. They indicate a nerve irritation, do they not? A. They do; either that or from tight bandage. Q. These were from trophic condition, or a nerve irritation? A. I couldn't say. Q. Does it make any difference at what point of the nerve the irritation occurs as to whether or not the blisters develop. A. You can have irritation in the spine and have a blister develop anywhere on the body. Q. And what nerve was there that could be irritated by an accident of this kind? A. The brachial nerve trunk.

The cross-examination was then directed at some length to the possibility of an injury to the brachial plexus from a broken clavicle causing paralysis of the arm or other damage thereto. The following extracts from the concluding part of that examination will tend to explain its results, and seems to be advisable in view of one line of the defense that the alleged diseased condition of the arm might have been directly caused through an injury to the brachial plexus without any fault on the part of the defendant. He said that the blistering might be a symptom of the impingement of a nerve in the brachial plexus; that if the collar bone had been driven upon the bundle or trunk of nerves, causing a contusion, the blistering might have been expected as one of the symptoms thereof. That a case must be judged upon its merits in determining whether the injury to the nerve occurred at the brachial plexus or farther down. That the nerves which were involved in the diseased condition of the plaintiff's arm were the three nerves of the forearm, the median, radial and ulnar; the median and radial both showing the greatest evidence of injury, and about the same. That in case of an injury to the brachial plexus from a breaking of the collar bone, the proper treatment would be to relieve the pressure—the bone should be cor-

rected, "and if I were aware of the difficulty being there I would relieve the pressure   *   *   *   let out the blood and tie up the blood vessels if I knew it." Describing as requested the location of Erb's point, he said that in the case of an injury to the brachial plexus there would be tenderness at Erb's point and possibly, though not necessarily, some swelling; but if there was swelling, it would not necessarily show an injury to the brachial plexus; that upon recently examining plaintiff's neck he did not find that she was any more tender on the injured side than on the other side, but found tenderness on both sides. Being called upon to then examine the child again he stated that he found a little swelling at Erb's point and diagnosed it as a reflex action of the nerve somewhere in the brachial plexus, stating that in case of an injury to the brachial plexus he would expect to find that swelling where he found it.

On re-examination he stated as his opinion that the cause of the paralysis or lack of feeling in the arm was "Pressure at the elbow, I thought from the line of demarcation where there was feeling above and none below.  Q.  It came from the cutting in of the flesh, didn't it?  A.  I thought so."

The plaintiff having rested her testimony the defense moved for a directed verdict on the ground of insufficient evidence to sustain the averments of negligence or the result of defendant's treatment; and also upon the ground that no evidence had been offered to show the amount or measure of damages. That motion was overruled, is here complained of upon exception to the ruling, and may as well be disposed of before proceeding further. Without going into a detailed explanation at this time of our views of the evidence submitted by the plaintiff, we think it was sufficient as against the motion for a directed verdict at the conclusion of the plaintiff's evidence in chief. It is not necessary in a case of this kind for the plaintiff to prove by valuation, estimates or computation the amount necessary to compensate for alleged injuries. The law provides no exact measure of damages for such injury in an action based

upon negligence. The amount of damages, if any be allowed, was a matter to be determined by the jury under proper instructions.

We shall at this point also dispose of some of the questions raised respecting the admission and exclusion of testimony offered by the plaintiff. Among the first of the specifications of error are charges complaining of the admission of statements of the plaintiff's father; and it is contended that they were inadmissible as non-expert opinions or conclusions. Some of such rulings admitted testimony over objection while others refused to strike answers. The testimony involved in these objections related, mainly, to plaintiff's condition following the accident, and the effect of defendant's treatment upon her condition, matters supposed to have come under the observation of the witness. Having been asked what the condition of his daughter's arm was at the time immediately after the accident, he stated that it was "perfectly all right." The defendant moved to strike the answer as a conclusion. The motion was overruled, and the ruling excepted to. Then following his testimony related above as to what was done by the defendant in setting the bone and bandaging the arm and the suffering complained of by the child during the following week, and the subsequent calling of Dr. Crane; and he was asked by his counsel what condition he found under the bandage which had been around the arm after its removal. His answer was "Where the bandage had squeezed this elbow in, it naturally killed the flesh." A motion to strike that answer as a conclusion and not responsive was not ruled upon, nor was there any insistence by counsel then or later for a ruling other than by the motion itself, but immediately following the statement of the motion, it appears that plaintiff's counsel suggested to the witness, "Just state the condition." And he answered: "That is the condition, the arm was dead under the elbow. It looked like a dirty white kid glove where this bandage had cut in there, had cut off the circulation." A motion was then made that

what the witness said as to cutting off the circulation be stricken out as a conclusion. That motion was overruled and the ruling excepted to. He then testified, among other things, that "within a month the arm was paralyzed, you could stick a needle in it any place and she had no feeling in it whatever." There was a motion to strike as not responsive the part of that answer referring to the paralysis. The motion was overruled and an exception reserved. Upon being asked if the defendant made any effort to discover the cause of the plaintiff's suffering he testified that he did not "in my estimation." An objection to the question as incompetent and immaterial had been overruled and an exception was reserved thereto. He was later questioned concerning his daughter's nervous condition, and testified: "Her nerves were shattered and her nerves are shattered today." The question was objected to after the answer was given "as incompetent, sufficient foundation not laid." The objection was overruled and an exception taken. Later he testified: "Her nervous condition before I never paid much attention to. But she never did cry at the least little thing like today. She is very sensitive. She had to write her lessons with her left hand. She was very backward in her lessons because she couldn't write fast enough to keep up with her class." There was a motion to strike that answer as not responsive, but it was not ruled upon, and there is no exception noted to the failure of the court to rule upon it. That is the situation also as to the objections to other questions and answers where no ruling was made.

Notwithstanding the form of the objection, whether to question or answer, substantially the only ground urged in support of the specifications relating to such testimony is that the evidence was incompetent as an opinion or conclusion of the witness, who was not testifying as a medical expert. But it is also argued in that connection as to a part, if not all, of such testimony, that the conclusion was such as to invade the province of the jury to determine the fact involved. The preliminary question therefore arises

whether any such ground may be considered upon the objection interposed to a particular question or answer which did not include that ground. For example, that an answer was not responsive was stated, either as the sole ground or one of the grounds for striking the same; and that such an objection will not justify a consideration here of the claim that the evidence should have been excluded because stating an opinion or conclusion, or a fact invading the province of the jury seems to be clear. Rules of decision may be applicable in one case that are inapplicable in the other. That an answer may be unresponsive is not necessarily, nor at all in some cases, a sufficient ground for requiring the exclusion of the testimony. Without intending a conclusive discussion of the effect of the objection by the adverse party that an answer is not responsive, some general observations concerning the matter may not be improper. In Jones Commentaries on Evidence, (2nd Ed., Sec. 2313), it is said that while in some jurisdictions it is held that only the examining party is entitled to raise the objection of "not responsive" the correct rule seems to be that the adverse party has no absolute right to have an answer expunged merely because it is irresponsive, but that if it is competent and pertinent, it is optional with the court to strike it or permit it to stand, and that a denial of such a motion to strike is not error. In the second edition of Wigmore on Evidence, (Vol. 2, Sec. 785), it is said:

"Where the witness, either in a deposition or on the stand, goes beyond the scope of the question, and makes an answer not responsive, there is here nothing 'per se' wrong. If the answer includes irrelevant facts, they may be struck out, and the jury directed to ignore them (ante, Sec. 18). If it furnishes relevant facts, then they are none the less admissable merely because they were not specifically asked for; * * * * The only ground of complaint for non-responsive answers is that, in the case of a deposition (for the reason above noted), such an answer may entitle the opponent to additional cross-examination on the new matter—a rule dealt with elsewhere (post, Sec. 1392.) Courts ought to cease repeating the unwholesome

assertion that 'where an answer is unresponsive to the question put, it is the duty of the court to strike it out, on motion.' This doctrine of responsiveness has somehow become in modern times beset with crude misunderstandings that tend to suppress truth, and turn the inquiry into a lagomachy; (1) Sometimes it is said that the *party questioning* may object on this ground; but not the opposing party. But there should be no such distinction; if the answer gives an admissible fact, it is receivable, whether the question covered it or not. No party is owner of facts in his private right. No party can impose silence on the witness called by Justice.''

In Berkley v. Burlington Cadillac Company, 99 Vt. 227, 131 Atl. 16, concerning alleged voluntary statements by plaintiff in answer to questions on cross-examination and assigned by defendant as error, the court said:

''Most of the questioned answers were not strictly responsive. However, it is not every irresponsive answer given by a party that will support an exception. Not only must such an answer be improper in substance, but it must be apparent that the party intends to go beyond the question and thereby gain an advantage. Answers of a party, though irresponsive, having some bearing upon the issues of the case, would not ordinarily present reversible error. The matter is to a large extent in the hands of the trial court, to be dealt with as justice may require.''

In, State v. D'Adams, 84 N. J. L. 386, 86 Atl. 414, Ann. Cas. 1914 B. 1109 (Vol. 32), the court said:

''The rules with regard to a motion to strike out testimony may be summarized as follows: Where an answer, or a part of an answer, is irresponsive to a competent question, the examiner may move to strike out what is irresponsive, whether it be competent evidence or not, but if competent, the adverse party has no such right. If an answer be relevant for any purpose, it may stand as against a motion to strike out.''

The answer stating that the arm became paralyzed might perhaps by strict interpretation bring it within such an objection, though if relevant and competent, it might, under the above authorities, be properly allowed to stand. And that is was relevant, as well as competent, we entertain no doubt. Its competency will appear from what we shall say concerning the objections interposed to part of the testimony of said witness as stating inadmissible non-expert opinions or conclusions. That it was relevant appears from the issues and other evidence in the case. The motion to strike the testimony concerning plaintiff's nervous condition and her backwardness in her studies would not, we think, have been objectionable as not responsive, though that question is not strictly before us, for the objection is here based entirely on another ground. The witness had been asked, without objection, to testify as to the nervous condition of plaintiff before and after the accident, and said answer was not, we think, outside of the field that testimony replying to such a question might reasonably cover; and we have no doubt that the evidence was relevant as well as competent, as the latter will more clearly appear presently.

Attention has been called to the fact that there was no ruling upon some of the objections. That was the situation as to one or more of the objections based expressly upon the ground that the question called for or the answer stated an inadmissible conclusion or opinion of the witness. Where no such ruling occurred no exception was noted, and there does not appear to have been any further insistence upon a ruling or any express objection stated or exception taken to the failure of the court to rule. And in this court errors relied upon must as a rule be presented upon proper exceptions. Thus it was said in Leach v. Frederick, (Wyo.) 253 Pac. 669, in this court's opinion by Mr. Justice Kimball, where a ruling had been reserved but none was made and there did not appear to have been a subsequent request for such a ruling:

"When the plaintiff acquiesced in the course pursued, and did not renew his objection by asking a ruling at some future stage of the trial, he was not in a position to assign as error the reception of the evidence. He should have obtained a ruling on which to base an exception."

We think the situation there was not materially different from that in this case, for it would seem that where there had been no reservation of a ruling, the principle stated is quite, if not more clearly, as applicable. It is said in Corpus Juris (Vol. 3, p. 912) that the well settled rule in most jurisdictions is that alleged errors in admitting or excluding evidence cannot be reviewed on appeal unless an exception was taken, and that a mere objection to the evidence or ruling, not followed by an exception, is insufficient to preserve the question for review. In 38 Cyc., page 1347, it is said that while a party who objects to the introduction of evidence is entitled to a ruling from the court, and that a failure of the court to rule on evidence received subject to objection, "upon request to do so," is error, yet, "in the absence of such request," a failure to rule is not error. See also 26 R. C. L. 1055.

The objection to the question whether the defendant made any effort to discover the cause of plaintiff's suffering was that the same was "incompentent, and immaterial under the issues of this case." There was no motion to strike the answer, which was that he did not "in my estimation." The objection did not necessarily call the court's attention to the claim that it might call for an expression of an opinion, especially as the word "incompetent" as well as "immaterial" was qualified by the concluding words 'under the issues of this case." We therefore doubt the sufficiency of the objection to justify consideration of the point now made, that it was objectionable as calling for an opinion. The exception was only to the ruling of the court based upon the objection made. And we think it must be conceded to have been perfectly competent as well as material under the issues to show, if it might be shown by

proper evidence, that no effort was in fact made by the defendant to ascertain the cause of plaintiff's suffering during the course and period of defendant's treatment. But we think the question might have been objectionable upon the ground that it invaded the province of the jury, whose duty it would be, if the matter was questioned, to determine whether any such effort had been made by the defendant; and it is now contended that the testimony was objectionable upon that ground. But since it is clear that the objection as made included the point, we prefer to dispose of the exception based upon the ruling and objection as made, upon the ground that the testimony was not prejudicial. What the defendant did during his treatment and what he did not do, in the respect indicated by the question, was testified to not only by witnesses for the plaintiff who recited the facts of his treatment as they had observed the same, but also by the defendant, who testified in his own behalf that he had upon his daily calls made such examination of the patient as was necessary under the circumstances, and described what he did. And we feel satisfied that the facts were sufficiently before the jury upon proper evidence or at least evidence not objected to, to render it fairly clear that the ''estimation'' or opinion of the witness added nothing that would justify a holding that the ruling admitting it was prejudicial.

We think that none of the other objections to the testimony of said witness McCoy, made expressly upon the ground that the statements were merely opinions or conclusions, was well taken. We have considered that character of testimony in previous decisions. Horn v. State, 12 Wyo. 80, 73 Pac. 705; Mortimore v. State, 24 Wyo. 452, 161 Pac. 766. In the Horn case there was quoted in the opinion the following from Hardy v. Merrill, 56 N. H. 227, 12 Am. Rep. 441, referred to as a leading case upon the subject:

"Opinions of witnesses derived from observation are admissible in evidence, where, from the nature of the subject under investigation, no better evidence can be obtained; * * * without reference to any recognized rule or principle, all concede the admissibility of the opinions of non professional men upon a great variety of unscientific questions arising every day and upon every judicial inquiry. These are questions of identity, handwriting, quantity, value, weight, measure, time, distance, velocity, form, size, age, strength, heat, cold, sickness and health; questions also concerning various mental and moral aspects of humanity, such as disposition and temper, anger, fear, excitement, intoxication, veracity, general character or particular phases of character, and other conditions and things, both moral and physical, too numerous to mention; * * * * and so also, in the investigation of mental and psychological conditions; because it is impossible to convey to the mind of another any adequate conception of the truth by a recital of physical and tangible appearance, because they cannot, from the nature of the case, describe emotions, sentiments and affections, which are really too plain to admit of concealment, but at the same time incapable of description; the opinion of the observer is admissible from the necessity of the case; and witnesses are permitted to say of a person: 'He seemed to be frightened;' 'He was greatly excited;' 'He was much confused;' 'He was agitated;' 'He was pleased;' 'He was angry.' All these emotions are expressed to the observer by appearances of the countenance, the eye, and the general manner and bearing of the individual; appearances which are plainly enough recognized by a person of good judgment, but which he cannot otherwise communicate than by an expression of results in the shape of an opinion."

In the Horn case also we referred to Shelby v. Claggett, 46 Oh. St. 549, 22 N. E. 407, L. R. A. 606, stating that a witness in that case was allowed to testify concerning a plaintiff suing for damages caused by personal injuries, that "her suffering was very intense, and often seemed more than she could bear," and that the court said upon the subject: "To say that those about a sick or injured

person shall not be permitted to give in evidence their opinion, based on observation, of the condition or suffering of the patient, is to exclude from the jury the only efficient proof of those facts. The rule admitting such evidence is one of necessity.''

In the Mortimore case, a murder case, evidence had been admitted to the effect that the witness did not think defendant was angry when the fatal shot was fired, but testimony to the effect that he was in a happy frame of mind that morning (the homicide having occurred in the morning) was excluded. Reviewing those matters, this court held that the evidence above mentioned as having been excluded was competent, and said:

''We think it was competent for the witness to state whether on the morning of the homicide the defendant was or appeared to be happy or angry, or whether at the time of the homicide he was or was not angry, or what appeared to be his mental condition in that respect. The matter is one of mixed fact and opinion, and the opportunity of the witness to have noticed the condition testified about, and how clearly it was noticed, may be tested on cross-examination, and the weight to be given to the testimony will be for the jury to determine.''

With reference to other rulings relating to evidence of what the witness thought or saw, which, for example, may be likened to the testimony of the witness in this case as to whether defendant made an effort to discover the cause of suffering, it was held that the testimony would be incompetent whether calling for an opinion as to whether the danger to the accused was iminent or an expression of what the witness thought about it, since the situation was capable of adequate description without stating the observer's opinions or conclusions as to the probable result.

As a part of the discussion of the general subject in Wigmore on Evidence, a list of cases seemingly applicable under the facts of this case will be found in a note to

Section 1974 of Volume 4 of the second edition of that work; and among the cases there cited with approval are the Wyoming cases aforesaid of Horn v. State and Mortimore v. State. See also Jones Commentaries on Evidence, Second Edition, Section 1248-52. The following among the most recently decided cases are, we think, also applicable here as supporting our conclusion upon the point. Davis v. Hynde, (C. C. A.) 4 Fed. (2nd Ed.) 656; DePalma v. Auto Supply Co., (N. J. Sup.) 130 Atl. 206; Koch v. Lynch, 247 Mass. 449, 141 N. E. 677; Hauer v. Cuschner, 125 (Wash.) 555, 216 Pac. 833.

Specified also as error are the rulings admitting the testimony of Dr. Crane that bandaging the elbow as it was bandaged he considered improper. The supporting argument is that under the guise of a hypothetical question the witness was in fact asked to state his opinion upon the ultimate fact in issue, viz: negligence in bandaging the arm at the elbow. But Dr. Crane was a medical expert witness, and was authorized to give the kind of answer that was given,—an opinion. In Wright v. Conway, 241 Pac. 369, we said:

"We find negligence on the part of the physician sometimes defined, generally, as consisting of his doing something which he should not have done, or in omitting to do something which he should have done. It is so defined in McGraw v. Kerr, 23 Colo. App. 163, 128 Pac. 70, wherein it was also said that the authorities are practically uniform in holding that as to what is or is not proper practice in examination and treatment, or the usual practice and treatment, is a question for experts, and can be established only by their testimony; and that is the general rule. (citing cases.) So the negligence must appear from expert testimony, and that it caused the condition complained of, unless relating to a matter of common knowledge."

See also Phifer v. Baker, (Wyo.) 244 Pac. 637; Lehman v. Knott, 100 Or. 59, 196 Pac. 476.

The witness was asked if such bandaging was proper treatment. And his answer was clearly an opinion based upon his knowledge of the science of his profession, and the question called for that kind of an opinion only. Counsel argues that there is a distinction between improper and negligent treatment. But the witness did not say that defendant's treatment was negligent. While the expert witness may not, as a rule, say that, he may say, if that be his opinion, and he is properly interrogated, that the treatment was improper. It was said in Lehman v. Knott, supra:

"The distinction between improper treatment and negligent treatment is not as broad as it is vital. Improper treatment by a surgeon might be due to an error in judgment of a skillful surgeon honestly and carefully exercised, and not constitute negligent treatment."

So it was held in that case that the witness might not testify that the application of certain splints was "unskillful and negligent," the criticism being confined to the use of the word "negligent;" for that, the court said, "left little or nothing for the determination of the jury." But the court had already said that in a malpractice case the question whether the physician has, in a given case, adopted the proper treatment, is one in which the opinions of medical men should be received in evidence, and they may state whether, in their opinion, the treatment was proper or not. It is no doubt true that there might be improper treatment by a skillful surgeon, honestly and carefully exercised, but based upon a mere error of judgment. And whether or not it would be a mere matter of judgment would probably remain a question for the jury to be determined upon evidence submitted, principally the evidence of medical experts.

It is well settled with respect to matters involving peculiar skill, science or knowledge, that witnesses possessing the requisite understanding, and called "experts" may

testify, not only to the facts, but also to their opinions regarding such facts; such things being considered necessary for the enlightenment of the jurors, in order to enable them to arrive at a just verdict. Jones, Comm. on Ev., 2nd Ed., Sec. 1312. It is further stated in that work that in a great variety of cases, subjects under investigation are wholly unfamiliar to the jury or even to the judge, and there would be no inadequate mode of arriving at any satisfactory conclusion if expert testimony were rejected. "In other words, expert testimony is admissible whenever the subject so far partakes of the nature of a science as to require a course of previous habit or study in order to attain a knowledge of it." id. It is stated in Section 1313:

"It is a general rule that the opinions of experts as to the cause of a particular occurance or accident are admissible where the subject matter is not one of common observation or knowledge. * * * * The usual objection is that expert opinion as to causation invades the province of the jury. But such an objection is not favored where the case appears to be proper for the admission of such evidence in accordance with the principles above discussed." In Section 1344 of the same work it is said: 'One of the most important fields for expert testimony, and one of those most commonly recognized, is the domain of medical science * * * * It is a general rule that an attending physician may testify directly to his opinion, where the subject is one for the testimony of a medical expert, and where his personal knowledge is such as to warrant an opinion." And in Section 1345 it is said: "A medical expert may also testify as to the probable effect of a given course of treatment or medicines, or as to what would be proper treatment under a given state of facts."

The objection to the said testimony of Dr. Crane was not well taken. The same may be said respecting another objection to his testimony, viz: That in his opinion the manner in which the elbow was bandaged caused the injury complained of. We think that was competent.

Phifer v. Baker, supra. Counsel for defendant complain also that the witness was asked the leading question whether or not the alleged paralysis of the arm was caused by the cutting in of the flesh. But there was no ruling upon the sole objection that the question was leading, and hence no exception. The elicited opinion may have been one of the ultimate questions of fact to be determined by the jury. But it was a question to be determined upon the testimony of medical experts.

It was shown by the testimony of two medical expert witnesses produced by the defendant, and who had been appointed by the court to examine the plaintiff, that at the time of the trial plaintiff's arm was entirely normal in appearance, except as disfigured by the scar at the elbow, which was described by one as about two and a half inches long at the bend of the elbow, might be thought to look like the scar of a burn, superficial in character, producing no pain and no loss of function of the arm, and having nothing to do with the bending of the elbow. The other said that the arm appeared to be in normal condition and to function normally; that the scar aforesaid resembled a slight burn, a scant half-inch wide and about two inches long, extending across the front part of the arm, but just in the skin and the fascia lying under the skin, not attached to any of the tendons or muscles and entirely free from pain. Each of said witnesses also testified that the arm was then not crooked but was straight.

Aside from that, the effect of the testimony of said witnesses and the other medical experts called on behalf of the defendant was to show, first, that defendant's treatment of plaintiff was proper and followed strictly the method adopted generally by skilled medical practitioners and surgeons, and indeed it was said by them to be the only method generally recognized for the treatment of a broken clavicle or collar bone; and, second, that the sore or necrotic condition found at the elbow upon the removal of the bandage might have been and probably was caused

by a nerve injury in the brachial plexus resulting from pressure of the fracture above it, rather than from any neglect in the treatment or lack of care on the part of the defendant. And we understand that testimony to have approved as proper the leaving of the bandage on the time it was allowed by defendant to remain unchanged, with occasional examination as testified to by defendant to determine whether there was any lack or disturbance of the circulation. But special reference to that testimony seems necessary, for a most careful consideration thereof is necessary to a determination of the remaining questions presented in the case.

The first witness was the defendant himself, who testified, first, that he is a graduate of the medical department of the University of Illinois, had one year's interneship in the hospital of that University, and had been engaged in practice since then continually for thirteen years, the last four years of which was as the company doctor at Monarch; his duties there being to take care of injuries to miners and look after the sickness of the camp, and requiring on an average the care of about six hundred people. Thus he established his qualification not only as an expert medical witness but as possessing recognized medical ability in the community where he lived.

He described his first visit at the home of the plaintiff and stated that she had suffered a "fractured collar bone" at the junction of the outer and middle third; that he observed no symptoms of any other difficulty, and treated the condition by applying what is known in the profession as a Sayre dressing and a Velpeau over that. He described the Sayre dressing as consisting of two strips of adhesive, one around the arm, across the back, and around until meeting the point on the back again, the other strip beginning at the shoulder, passing down over the olecranon process at the elbow, the posterior surface of the forearm, up over the hand, over the shoulder far enough down the back to "take a good hold."

That when applying the Sayre dressing he padded the arm with strips of gauze,—"six or eight pieces around the arm before the adhesive." That the tape was attached in a diagonal form, starting lower down, wound diagonally next to the bandage; then placed around the body with the adhesive next to the skin. That the purpose was to draw the arm back to bring the shoulder in normal position, thus bringing the two ends of the fracture in apposition, and that his effort as described did have that effect. That at the elbow, where the second strip of tape crossed the bandage of the first on the arm and at the fingers it was against the hide or skin except the back of the hand and at the elbow; that it crossed the bandage of the first tape upon the arm and at the fingers, "left the fingers free, but under the tape there were two strips of gauze;" that under the tape at the elbow he "put a pad and a figure eight dressing to hold that in place so it wouldn't slip—a pad made of six or eight strips of four-inch gauze;" that "there was a bandage of the figure eight nature wrapped diagonally across the elbow, that is, across the bend of the elbow, and when the arm then was flexed, that bandage would loosen up and become a pad for the anterior surface—to protect the bend of the elbow, so as to keep the skin from coming in contact with skin," which might cause a foul secretion and more or less necrosis. He testified that the figure eight bandage was not tight, but was laid in padding, having been put on "before the arm was flexed," so that "as you flex the arm the bandage became the padding."

He described the Velpeau bandage as nothing more than an outer dressing to hold in place the Sayre bandage, making "the dressing complete." We shall not attempt his detailed description of that, but he stated that the bandage that holds the bone in place is the Sayre dressing; that the Velpeau is merely an extra application "and makes things look nicer." He also testified that his treatment in applying the two dressings is not only a recognized method of treating such an injury, but was the only recognized treat-

ment and was used generally by physicians and surgeons in that vicinity for injuries of that kind.

He testified that having set the arm on Sunday night he called there Monday and Tuesday and again on Wednesday, putting on an extra bandage on that day, intending to change the bandage entirely on Friday and leaving material there for that purpose on Thursday, when he called, intending then to take the bandage off and put on a new one, the bone appearing to be in a good position; that Saturday morning he asked the mother how the child was and she said 'Resting fairly well,'' so that he did not call at that time, but later in the day when he called he saw the blistered arm and learned that another physician had been called to take care of the case. That after his first visit the child complained of discomfort, not sleeping well, and of pain from the bandage at different places on the arm and at the elbow; but that such condition was ordinarily to be expected in the case of an injury of that kind; that the Sayre bandage always caused pain and discomfort because it kept the arm in an abnormal position. But he noticed no indications of any unusual conditions or complications; that there was the appearance only of an uncomplicated case of a fractured clavicle. That at each visit he examined the finger nails, felt the elbow at the edges of the adhesive tape to see if there were any blisters, found the finger nails to be pink and normal, showing the circulation to be all right. That the usual practice of physicians of skill and learning is to leave the Sayre dressing on for three weeks in the case of children, unless there is an indication to the contrary. That he noticed no indication of complications until the Saturday night when he was discharged from the case, at which time he saw some trophic disturbance and nerve injury causing blisters and the other condition at the elbow.

He was asked if, from the indications then noticed, he could determine the point of the injury to the nerve. He

answered that he did not have the privilege of examining
the arm at that time; but that he could tell exactly where
the nerve had received the injury; that anything interfer-
ing with the three functions of the nerve can always be
traced back if it is understood where the nerve is and
what parts that nerve supplies; and that, from the symp-
toms and what he then knew, it was his judgement that
the nerve which caused the complications was located in
the brachial plexus, which lays upon the scalenus muscle
in the posterior triangle of the neck. Then, describing
more in detail the "brachial plexus," where the nerves
thereof originate, to what points they continue, and what
parts they serve, he stated that brachial plexus compli-
cations are common and may be expected in connection
with a collar bone fracture; that a nerve may be either
severed or bruised, or a clot may form, but that the symp-
toms of the injury will be delayed. That the cause of the
injury in such a case is either the pressure of the broken
collar bone, or simply the jar of the break. That the
sloughing at the elbow was caused by the skin getting in
apposition with skin right at that angle, whereby the
nerve injury was more pronounced at that point than at
any other. He said further that it is not possible, using
ordinary care in the binding and bandaging of the arm, to
prevent entirely such a condition, but that the few blisters
on the forearm and the swelling as well as the injury at
the elbow were superficial; that the condition had not
existed for over twenty-four hours and that there had
been no symptoms thereof that could have been observed
before that time. He located and described Erb's point,
and stated that as thus located upon the plaintiff, it dis-
closed a swelling indicative of an injury to the nerve
cord of the brachial plexus.

We shall refer but briefly to his cross-examination, and
merely to state that he testified again positively that he
not only did but was able to look at the finger nails, not-
withstanding the Velpeau dressing covering, and could

run his finger in at the elbow and look under the edge of the adhesive at any point of the elbow and also at the wrist. That the conditions which occurred in the forearm of the plaintiff could not have been caused by strangulation at the elbow, though there might have been partial strangulation, which has reference to the artery or circulation; in which case there might be a swelling of the arm from the point of the strangulation to the hand and fingers, the finger nails and hand would be black, or in case of complete strangulation there might be a pale color; that he did not remove the Velpeau dressing because there had been no indication suggesting the necessity thereof while he had charge of the case. That he inspected the case substantially every day and discovered nothing wrong until the signs of the complication on Saturday evening, at which time he was not permitted to continue his treatment.

Dr. Mallin, one of the witnesses appointed as aforesaid to examine the plaintiff, employed at the time of the trial as acting assistant surgeon in the U. S. Veterans' Bureau at Fort McKenzie Hospital, near Sheridan, in the county where the action was brought and tried, and who had practiced medicine and surgery since 1893, when he graduated from Bellevue Hospital Medical College in New York City, testified: That the recognized form of treatment all over the world for a fracture of the collar bone is the Sayre dressing, describing it substantially the same as explained by the defendant when describing the manner of his application of the dressing. Also, that it was good surgical practice to put a bandage around the body, known as the Velpeau, to hold the Sayre dressing in position. That usually a pad of gauze was placed in the elbow to keep skin from pressing against skin and avoid excoriation and blistering. That a pad may be used also along the outside of the elbow. He was then asked: "It has been testified by Dr. Clegg that in placing a pad around the outer elbow  *  *  *  *  a figure

eight bandage, wrapping it around above passing over the inside and then around and coming back and passing again on the outside of the elbow back to the place of beginning. I will ask you whether that is a bandage commonly used by surgeons in their practice?''

His answer was: ''It is. * * * * I think it is good practice to protect the skin,'' and its natural effect would be to protect the skin. He testified that he could not state the cause of the scar, but that it might be one of the results of an injury of a nerve in the brachial plexus at the time of the accident; that his examination of the child at what is known as Erb's point showed a swelling of the nerve trunk due to a previous injury of the brachial plexus, which he described at some length in connection with a sketch that he had made, and which, under questioning by counsel, he explained. He testified, however, that at the time of the fracture such an injury might not be discovered because the symptoms would not then have developed, and perhaps would not develop until after a period of three or four weeks. That as the result of an injury to one of said nerves, the skin might suffer in its nutrition; that blisters sometimes appear during the treatment of fractures of the kind in question, sometimes because of the adhesive plaster and sometimes because of the deterioration of the nerve. He was then asked: ''It has been stated here that a test was made of this arm about the 17th of November, after the injury, when lack of sensation was found in the lower arm and the existence of sensation in the upper arm. What would that indicate?'' He answered: ''It might indicate, to my mind, that there had been an injury of the brachial plexus and that since such examination it has recovered function.'' He was then asked: ''Would that indicate that the injury to the nerve was at the elbow, down here?'' He replied, ''It wouldn't indicate it to my mind, no.'' He also testified that he knew, of course, that the scar was caused by a sore, and stated as his opinion that

said sore could have been one of the results of an injury to a nerve at the brachial plexus at the time of the accident.

Dr. Stevenson, a practicing physician and surgeon at Sheridan, and engaged in practice for twenty-five years, testified that the Sayre dressing is one approved by medical science and generally used by the profession, and also the Velpeau dressing. That if an injury was caused by the accident to the brachial plexus of nerves, the fact would not have been discovered at the time by the medical attendant called in possibly 24 or 30 hours afterwards. He was asked to testify whether, in applying the Sayre dressing, the padding used at or near the elbow on the inner side of the arm should necessarily be placed in the same manner in each case, to which he replied that he did not think there was any fixed rule regarding padding, but it would be necessary where skin comes together to use some protection; and, answering further questions, that notwithstanding the use of a gauze or other pad at the elbow, a tropic condition might result. He testified also that he would consider the application of the figure eight bandage which had been described by the defendant as a good dressing and as one approved by the medical profession. Also that after such bandaging of the arm and body it would be good treatment if the attending physician called once or more on the following day, again on the third and on the fourth and on the fifth and examined the tips of the fingers for any signs of strangulation, without taking down the dressing. That a Sayre dressing is usually kept on until there is some callus thrown out around the bone, "which starts from a week to ten days or two weeks." That such a dressing is not usually taken off within less than a week. That blisters usually follow a fracture, due "to nerve shock." That "we always have tropic condition more or less where you put an arm or leg at rest without any muscular exercise; there is atrophy, the limb grows smaller, atrophy of the

muscles from non-use.'' That an injury to the brachial plexus, if shown to have occurred by reason of the fracture, would make such tropic conditions worse, or rather, that the cutaneous supply would make it worse. On cross examination that witness testified to having had a case of a clavicle break where he supposed there had been injury to the brachial plexus because blistering had followed, that being "the only sign we have to go by.'' He then testified:

"Where, after a few days, following a broken clavicle, the flesh of the arm inside the elbow proper becomes dead or gangrenous and subsequently sloughs off, and there is an offensive smell, the tendons are exposed, the sloughing process extending across the entire arm on the inner portion, would you say that is a natural result of a possible injury to the brachial plexus? A. I would say that if the wound sloughing was deep, probably wouldn't be. We have blistering that comes from superficial and inner skin with a discharge of serum. Q. Now, doctor, if the bandage were placed around the arm at the elbow in such a manner that when the arm was later flexed, and the Sayre dressing applied, the circulation was seriously interferred with so that ultimately this flesh becomes dead, as I have said, would not the blistering of the forearm be the probable or natural result of the strangulation or partial strangulation of the arm at the elbow? A. If a bandage was tight enough around the elbow and arm to cause an obstruction, you would have a blueness of the forearm and a swelling and would be unable to get the radial artery at the wrist. Not so liable to have blistering of the forearm. Q. You never had a case of that character, did you, doctor? A. No, sir. Q. When you are advised, either by a patient or one of those in attendance, that he is suffering pain, would you not, under medical science as it exists at the present time, immediately undertake to determine what the cause of the pain is? A. Yes, sir.''

On re-direct examination he was examined with reference to this part of his testimony. We shall not attempt a repetition of that here, but it may be sufficient to say that he testified that there is always more or less pain with a

fractured clavicle and complaining on the part of the patient of suffering, such pain frequently occurring at the point of the elbow. On re-cross examination, he was questioned and testified as follows, among other things:

"Where a surgeon in setting a broken collar bone places a bandage around the elbow in such a manner that when the arm is flexed it strangulates or partially strangulates the arm, and cuts into the flesh so that within six days thereafter it sloughs off to a depth exposing the tendons, and this condition is permitted to continue for a period of six days, would you say that was proper medical treatment? A. I should say that was not; that was leaving it on too long. Wouldn't be good medical treatment to leave it if the flesh was cut through and the tendons were exposed."

On re-direct examination, he testified that if by the use of the Sayre dressing the arm of the child was bandaged so tightly at the elbow that the circulation of the arm was cut off and stopped, there would be an indication thereof in the fingers or forearm within 24 to 36 hours; that there would have been numbness of the hand, it would be blue, and you would fail to get a radial pulse. That if circulation was cut off and stopped on the next day after the bandaging of the arm, and nothing done to remove the strangulation until the expiration of six days, the natural thing to expect would be that the forearm would be dead at that time, that the artery would have been ruined in six days so that there would have been no circulation and amputation would be necessary.

An exception was reserved to a ruling admitting this last mentioned evidence upon objection to the quoted question, which will be considered at the proper time. It would unduly extend the opinion, which has now grown to a length we had not anticipated or desired, to refer specifically to the testimony of the other medical witnesses, but it may be said generally that it approved the manner of defendant's treatment as proper and as regularly employed by skilled physicians and surgeons, and the man-

ner also as described by him of applying the bandage; and it should be said also that Dr. Marshall, a practitioner of many years standing residing at Sheridan, gave it as his opinion that from the history of the case as he had heard it described from the witness stand, the necrosis and blisters were due to an interference with the nerve function following injury at Erb's point.

Mrs. Ross and Mrs. McCoy were recalled on rebuttal and testified with reference to the examination of the hand and pulse of the plaintiff by the defendant during his visits while attending her, the purport whereof was that it was not possible for such examination to have been made because the bandages and underclothing covered the arm completely and the doctor could not even see the finger tips without removing the bandages. There was some cross examination upon this, which need not be specially referred to, except to say that Mrs. Ross then testified that the doctor at one time, when she was present, reached underneath the bandages and felt of the collar bone and said that ''she is all right.'' Mr. McCoy was also recalled, but merely repeated his previous testimony that during the three times that Dr. Clegg called he made no examination whatever and that it was not possible to examine the wrist without taking off some of the bandages, which he did not do while he, the witness, was present. We consider this part of the testimony of little or no importance to overcome the effect of the positive testimony of the defendant stating the extent of his examination during his several visits, nor should it be supposed, we think, that the jury may have relied upon this part of the evidence in arriving at their verdict.

The exception referred to above as to a ruling upon objection to a question propounded to Dr. Stevenson is based upon the ground stated as a part of the objection that it assumed matters not proven or not in evidence, aside from the general objection that it was incompetent, irrelevant and immaterial. But that testimony was preceded by an ex-

amination of that witness on cross examination about which no complaint seems to be made, which assumed substantially the same facts, but required of the doctor an answer concerning a different matter, as, for example, whether it would be proper practice to so bandage the arm as to cause that result, and whether that result, under the circumstances, might have come from an injury of the nerve at the brachial plexus.   And there was evidence in the case, given by Dr. Crane, to the effect that there had been at least a partial stoppage of circulation or strangulation of the arm, and in his testimony he expressed a feeling of doubt entertained at the time whether he might be able to restore the circulation.   We think, therefore,.that it was not error to allow the question to be answered.

This brings us to a consideration of the exceptions based upon instructions given or requested, a matter of procedure to which some objection was taken at the trial and which is complained of in the appellant's brief, and the general question raised of the sufficiency of the evidence. This matter we will consider first.   At the conclusion of the testimony of the plaintiff as a witness in her own behalf, the following is shown by the record to have occurred:

"By Mr. Lonabaugh:   I want two or three of you jurors to just take hold of the arm above the elbow and then below.   (referring to the injured arm of plaintiff.) By Mr. Wright:   To that the defendant objects as incompetent, the foundation not laid.   Objection overruled.   Defendant excepts.   By Mr. Lonabaugh:   That is for the purpose—— By Mr. Wright:   Object to your statement of that for the purpose.   At this time, the six jurors on the front row felt of the arm."

Shortly preceding that, this occurred, though it is not referred to in the brief as objected to, and indeed an objection, though interposed, was not ruled upon.   Plaintiff's counsel is reported to have said to plaintiff, then on the witness stand:

"You may hold out your arm in this manner to the jury (indicating). I want the jury to notice the difference in the shape. By Mr. Wright: Object to your remarks. By Mr. Lonabaugh: I want to call the jury's attention to the condition of the arm, which is in evidence. I want them to see the difference in the arm, in the two arms."

But it does not appear that the plaintiff at that time did hold out her arm for the jury's inspection. This procedure is questioned on the ground that only a part of the jury was asked to and did examine the arm. The record does not show that the inspection of the actual arm by the six jurors was objected to except by the objection above stated; that is to say, the objection was not repeated when the six jurors examined or arose to examine it. Nor was that objection on the ground that the proposal referred to two or three jurors only or only a part of the jurors. We are inclined to the opinion that the record is therefore insufficient to clearly present the question of irregularity for consideration. However, we think it ought to be said that we think it may have been irregular to permit a portion only of the jurors to feel of the arm, whatever the purpose thereof, but that it could not be reasonably held to be prejudicial or reversible error in this case. It was held in Crubaugh v. Murphy Co., 209 Mich. 551, 177 N. W. 217, not to be error for *all* the jurors to feel of a lump in a plaintiff's injured arm, and the court quoted the following from Baldwin on Personal Injuries, 2nd Ed., Sec. 527:

"In an action for damages resulting from an injury, the plaintiff may exhibit the injury to the jury. Such an exhibition tends to make the description of the injury more intelligible, and it cannot be supposed to have an undue influence upon the feelings and sympathies of the jury * * * * . It cannot be assumed that any such consequences would follow such action. Such evidence is immediate, real evidence, where the thing which is the source of evidence is presented to the tribunal and of all proof is most satisfactory and convincing of the injury received."

And the court continued: ''If the sense of sight may properly be used in determining the extent of an injury, it is difficult to see why the sense of touch may not also be used.''

Thus, in the Michigan case, the question was determined as a matter of evidence received by the jury through the sense of touch. And we doubt if it could be sustained where only a few of the jury were permitted to receive that evidence. In Am. Brake Shoe & Foundry Co. v. Jenkins, 121 Ill. App. 267, it was held that where a party was permitted to exhibit his injuries to the jury, it was not error to allow a juror to take hold of his arm and move it up and down to ascertain for himself the extent of the injury complained of. But *there* the exhibition of moving the arm was *witnessed* by *all* the jurors, after the plaintiff had testified that he could not move his arm because it was sore. The court said:

''The point is made that to permit one of the jurors to take hold of, move and bend the arm of the plaintiff in order to ascertain for himself whether or not the arm was stiff or otherwise permanently injured, is quite a different matter from permitting all of the jurors to view the injuries together. Counsel for appellant cite in support of their contention Stampofski v. Steffens, 79 Ill. 303; Doud v. Guthrie, 13 Ill. App. 653, and Consolidated Ice M. Co. v. Trenton Hygeian Ice Co., 57 Fed. 898. All these cases, however, pass upon personal examinations or inspections made by jurors out of court during recess of the court, and not in the presence of the court, or an officer of the court. There are many obvious reasons for not allowing jurors to supplement the knowledge of the subject matter in investigation obtained in court from the evidence produced, by pursuing personal and private investigation out of the presence of the court, during the trial. * * * * This would not only be irregular, but it would necessarily result in permitting the inquiry by jurors to go beyond the control of the court and beyond the established rules of evidence, and into irrelevant and immaterial matters.''

The court, however, evidently considered the situation in the case then before it as different from independent investigation by one or more jurors, for what was done occurred in the presence of the entire jury, so that all might see that at least with assistance the arm could be moved up and down, and that was held not to be improper.

Dr. Mallin, when testifying in the case at bar, was asked to feel of plaintiff's arm both above and below the elbow and, upon doing so, stated that he noticed no difference. Exactly what was intended to be shown by the personal examination of the jurors does not, we think, clearly appear, but the testimony of Doctors Mallin and Dolan, who examined the arm under appointment by the court, and who testified that it was entirely normal in every respect, which evidence came into the case after the demonstration we are now considering, is alone sufficient, we think, to have destroyed any possible prejudicial character of said demonstration.

The motion at the close of all of the evidence for a directed verdict in favor of the defendant was, we think, properly overruled. The evidence with reference to the existence of a sore at the elbow, as described by Dr. Crane and others, does not seem to have been brought into dispute by the defendant's evidence, and the testimony of Dr. Crane remains therefore, in the case, stating his opinion of the cause thereof; in addition to which the testimony of Dr. Stevenson upon cross examination by plaintiff's counsel, relating to the effect of leaving the bandage on at the elbow the length of time it was allowed to remain, was subject to the jury's consideration. And while there was reputable and rather strong evidence of medical experts produced by defendant supporting his theory as to the cause of the blisters, sore or necrotic condition at the elbow, it was in the main problematical leaving the fact to be determined upon the evidence and necessarily by the jury. It is true that Dr. Marshall stated as his opinion that the cause was an injury occurring to the nerve or nerves at the bra-

chial plexus. But we perceive no reasonable ground upon which it might be concluded that the trial court erred in not deciding that point upon the facts in favor of the defendant by directing a verdict in his favor. And we might also at this time state our conclusion that the evidence in support of the theory that the tightness of the bandage or the length of time it was allowed to remain unchanged may have been the cause of the condition aforesaid is sufficient, if believed by the jury, to sustain the verdict, if they were not convinced, and we think it must be assumed that they were not, that the said condition was the result of injury to one or more of the nerves at the brachial plexus. And in arriving at this conclusion we do not depart from our views in Wright v. Conway, as to the evidence necessary to require the submission of a case of this character to the jury. In the case of Baker v. Phifer, supra, the evidence was conflicting as to the cause of the injury, and also as to the facts concerning the treatment and the character of the injury to be treated. And we sustained the verdict for the plaintiff in that case, although we stated that the evidence supporting the theory of the defendant in the case would have been sufficient, if believed by the jury, to have sustained a verdict in his favor.

The following instruction was excepted to and it is contended here to have been erroneous:

"The court instructs the jury that proof of negligence need not be by direct testimony, but may be inferred by the jury from all the facts and circumstances in evidence in the case if they be sufficient to warrant it."

It is argued that the instruction permitted the jury to consider the fact of the injury itself as proof of negligence, thereby applying the rule of res ipsa loquitur. And counsel for plaintiff in their brief accept that argument as correct and say that the said instruction did inform the jury that they might consider the injury to the arm as evidence of neglect on defendant's part. And they also

insist that such is the law of the case. But in their argument they cite such malpractice cases only as were a sponge or some foreign material has been left in the body of the patient following an operation, or an independent infection caused, not as a direct part of the treatment, but through some neglect or lack of care in other respects, where the res ipsa loquitur doctrine has been applied.

Counsel for both parties, however, are, in our opinion, mistaken as to the character and effect of this instruction, and especially of its effect in this case. If it did apply the res ipsa loquitur rule to this case, as admitted by plaintiff's counsel, then, indeed, it would be necessary to reverse the judgment. For that rule is very clearly not applicable to the facts and circumstances of the case at bar.

This question was discussed in Wright v. Conway, supra, and among other cases referred to was Ewing v. Goode, (C. C.) 78 Fed. 442, decided by Chief Justice, then Circuit Judge, Taft, and the following was quoted therefrom:

"A physician is not a warrantor of cures. If the maxim 'res ipsa loquitur' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.' "

In Hanson v. Harris, 44 S. D. 457, 184 N. W. 262, the court said:

"The mere fact that the plaintiff's limb was not restored to its natural condition and usefulness does not prove nor even imply that appellant was negligent or unskillful. Physicians and surgeons are not to be held responsible for results, but only for the kind of service rendered by them."

And many other recent cases may be cited to the same effect. See Parker v. Bowen, 98 (Vt.) 115, 126 Atl. 522, wherein the court say: "Nor does the result afford evidence

of malpractice.'' Fox v. Mason, 139 (Va.) 667, 124 S. W. 405, wherein the court said: ''The doctrine of res ipsa loquitur has no application, and negligence must be proven,'' citing Ewing v. Goode.

But the instruction complained of is not generally, either in form or effect, to be regarded as an instruction based upon the res ipsa loquitur rule, and certainly is not to be regarded as intended to have or as having that effect in the case at bar. It is frequently stated in the books and in judicial decisions that it is not necessary that negligence must be proven in all cases by direct or by eyewitness testimony, without intending thereby to declare or to apply the res ipsa loquitur rule. Thus it is said in 20 R. C. L. 180:

''To establish negligence, direct and positive evidence is not essential; proof of the fact may rest entirely in circumstances—in other words, circumstantial evidence alone may authorize a finding of negligence. * * * * To establish negligence, however, there should be either direct proof of the facts constituting such negligence, or proof of facts from which negligence may be reasonably presumed. Its existence may not rest in mere conjecture, but this rule does not conflict with the rule that the verdict of a jury on a question of injury ought not to be disturbed where the evidence is such that reasonable men may fairly differ as to whether or not there was such negligence. The ultimate fact of negligence is an inference, to be drawn from all the circumstances of the case, but evidentiary facts must be established that would warrant a reasonable person in inferring negligence.''

Following that, on page 184 of the same work, the doctrine of res ipsa loquitur is separately described and discussed. So it was said in Arizona etc. Copper Co. v. Dickson, 22 Ariz. 163, 195 Pac. 538, 44 A. L. R. 881: ''The law is not so exacting as to require every fact and circumstance going to make up a case of negligence, or to identify the proximate cause, to be proved by eyewitnesses, or positive, direct testimony.''

And in Rocha v. Payne, 108 (Nebr.) 246, 187 N. W. 804, the distinction between mere circumstantial proof and the res ipsa loquitur rule seems to be stated in disposing of the question of negligence upon the facts in that case, a personal injury case by a railroad employee against the Director-General of Railroads:

"The doctrine of res ipsa loquitur is frequently applied to cases of this character, and many cases could be cited where it has been so applied, but we are of the opinion this case does not necessarily depend upon the application of the maxim. Negligence is a question of fact, and, like any other fact, may be established by circumstantial evidence. All that the law requires is that the facts proved, together with the inferences that may be legitimately drawn from them, shall indicate with reasonable certainty the existence of the negligence complained of."

In Coppin Co. v. Richards, 191 Ky. 720, 231 S. W. 229, also a personal injury case, the court said:

"It may be stated as a well recognized principle that negligence, like any other fact, may be proven by circumstantial evidence; that is, by proving facts from which a reasonable person could readily infer the ultimate fact of negligence. Direct evidence by an eyewitness was not any more necessary in this case to prove the contested fact than in any other case."

Thus a clear distinction appears in the authorities between the instruction complained of and the rather positive rule of res ipsa loquitur. Nevertheless, we think the instruction should not be given in a malpractice case of this kind, where the alleged specific acts of negligence refer entirely to diagnosis or the method of treatment. The bandaging of the arm was not a separate and distinct matter from the setting of the broken collar bone, but a necessary part of that treatment, and a part of the method usually employed to reduce the fracture of a broken collar bone. There is no room for the res ipsa loquitur rule under

the rules approved by this court in Wright v. Conway and Phifer v. Baker, supra, declaratory of the law governing the contractual duties of a physician or surgeon and his liabilities thereunder, especially the rule that the fact of negligence must be established by the evidence of medical expert witnesses, or, that the fact of negligence must appear from the expert testimony, and the fact also that it caused the condition complained of, unless the injury should relate to a matter of common knowledge concerning which no expert evidence would be necessary.

But counsel for plaintiff contend that the instruction is supported by Wheeler v. Bowles, 163 Mo., 398, 63 S. W. 675, decided by the Supreme Court of Missouri in 1901, a malpractice case. The same instruction appears to have been given in that case, except that it omitted the closing words of the instruction in this case, "if they be sufficient to warrant it." That is to say, if the circumstances be sufficient to warrant. But while there was an exception in that case to said instruction, and the fact of the exception is stated in the opinion cited, it was not considered by the appellate court, as will be readily seen upon a reading of the opinion. Hence that instruction depends for its support in malpractice cases alone upon the fact that it was given by one trial court. No other malpractice case where it was given has been cited.

But while we have discussed this instruction in order to dispose of the arguments concerning it, we are of the opinion that the giving of the instruction, though it may not have been justified by the facts in the case, was not reversible error because clearly not prejudicial. This appears from the other instructions in the case. The first instruction repeated, though without quoting, the averments of negligence in the petition, showing particularly that they charged negligence in bandgaging the arm at the elbow, and in negligently permitting the arm to remain bandaged for the period of about one week, resulting in the injury alleged in the petition; and stating also that the defendant

denied any careless or negligent act on his part and alleged that he used due care in setting the bone and bandaging the arm, and that the same was done in the manner that competent and skilled physicians usually care for their patients in like circumstances.

The second instruction, which appears to have been given without objection, is especially important in connection with the point now under consideration. It stated that the fact was not disputed in the case that by reason of the fracture of plaintiff's collar bone, she had suffered an injury to her arm, the nature and extent of which is for the jury to determine from the evidence. That the plaintiff ascribed such injury to the negligence of defendant and his unskillful bandaging of the arm at the elbow and permitting it to so remain for a period of about one week. That on the other hand, the defendant ascribed such injury as may have occurred to the arm to an injury of the nerves at or near the point of the fracture which supply the muscles and tissues of the elbow and forearm, bringing about a necrotic condition of the flesh at or near the elbow which ordinary medical care and attention could not have prevented. That instruction then stated that it was for the jury to determine from the evidence whether plaintiff's said injury was due to the unskillful bandaging of the right arm of the plaintiff at the elbow, and permitting it to so remain, or whether it was due to some other cause; and that if the jury believed from the evidence that the plaintiff had shown by a preponderance thereof that the cause was the unskillful bandaging of the arm and permitting it to so remain for the period aforesaid, then the verdict should be for the plaintiff. But if plaintiff had failed to prove that such was the cause of her said injury by a preponderance of the evidence, then the verdict should be for the defendant.

That instruction was followed by one stating that the degree of care, skill and diligence required of physicians and surgeons is only that ordinarily possessed by the average members of the profession in good standing in similar

localities, and that they are not liable for negligence on account of mere error of judgment resulting in incorrect diagnosis or because other physicians in good standing might have adopted another method of treatment. But that if the method adopted is one generally approved by medical science, it is sufficient, and where there is a difference of opinion a physician may exercise his own best judgment. Then followed the instruction complained of.

Thus the issue between the plaintiff and defendant as to the cause of the injury was submitted to the jury to be determined upon the evidence as to that cause—whether caused by unskillful bandaging of the arm and permitting it to remain so bandaged, or by injury to the nerves in the brachial plexus; those being the nerves clearly referred to in the instructions, when mentioning the claim of defendant as to the cause of the injury. And this clearly withdrew from the jury any privilege of regarding or accepting the fact of the injury at the elbow as sufficient evidence in itself to show negligence, should it have been supposed that the jury might otherwise have had the right to exercise such a privilege of judgment.

For the reasons above stated, the judgment must be affirmed and it will be so ordered.

*Affirmed.*

BLUME, Chief Justice, and KIMBALL, Justice, concur.